NICK HADDAD vs. LUZ GONZALEZ.

Suffolk. April 4, 1991. - August 12, 1991.

Present: LIACOS, C J, WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Judge. Practice, Civil*, Disqualification of judge. *Emotional Distress. Landlord and Tenant*, Habitability. *Consumer Protection Act*, Landlord and tenant, Emotional distress. *Damages*, Breach of implied warranty of habitability.

On the record of a summary process action, no abuse of discretion appeared in the judge's denial of the defendant's motions that the judge disqualify himself from the case. [860-864]

This court concluded that, in appropriate circumstances, a tenant may recover multiple damages for the intentional infliction of emotional distress committed by a landlord in violation of G. L. c. 93A, § 9. [864-870] LYNCH, J., dissenting, with whom NOLAN, & O'CONNOR, JJ., joined.

In a counterclaim asserted under G. L. c. 93A, § 9, by a tenant against her former landlord, the judge's conclusion that the tenant had proved a common law claim for intentional infliction of emotional distress was supported by the evidence and his findings were not clearly erroneous [870-871]; furthermore, the tenant was not required to prove that she sustained a physical injury to recover damages [871-872].

In a civil action in which the defendant, a former tenant of the plaintiff, counterclaimed for breach of the implied warranty of habitability, the judge applied the correct measure of damages in awarding the tenant the difference between the actual value of the apartment in its defective condition and the fair market value of the apartment as warranted, i.e., benefit of the bargain damages. [872-873]

A party was entitled to correction of a clerical error in the calculation of damages he was required to pay in a civil action. [873-874]

SUMMARY PROCESS. Writ in the City of Boston Division of the Housing Court Department dated April 18, 1983.

The case was heard by *Patrick J. King*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*F. Anthony Mooney* (*Jerry E. Benezra* with him) for the plaintiff.

*Lori Weiner Lander* (*Gary Bellow* with her) for the defendant.

GREANEY J. After her landlord, the plaintiff Nick Haddad, commenced a summary process action in the Housing Court for the city of Boston for nonpayment of rent, the defendant, Luz Gonzalez, filed six counterclaims alleging: (1) breach of the implied warranty of habitability; (2) breach of the covenant of quiet enjoyment in violation of G. L. c. 186, § 14 (1990 ed.); (3) negligent failure to maintain the premises; (4) intentional infliction of emotional distress; (5) retaliation in violation of G. L. c. 186, § 18; and (6) violations of G. L. c. 93A. After a trial, a judge of the Housing Court found in favor of Gonzalez on all of her counterclaims and awarded her damages under c. 186, treble damages under c. 93A (for the intentional infliction of emotional distress and violation of the warranty of habitability), and attorneys' fees and costs. (Haddad's claim for possession had become moot because Gonzalez had vacated the premises prior to the trial.) Haddad appealed, and we transferred the case to this court on our own initiative. We now affirm.

We take the facts from the judge's findings. Haddad is in the business of owning and renting residential property in Boston. In January, 1983, Gonzalez rented an apartment in a building that Haddad had owned since 1979, and she moved in with her four small children. The apartment was in "deplorable" condition at the time, but Gonzalez took possession because Haddad's agent assured her that the defects in the apartment would be repaired.[1] The contract rent was

---

[1] Haddad was aware of the condition of the building. In 1979, Haddad received notice from the Boston housing inspection department of a number of housing code violations in the building. In 1981, a Legal Services Center inspector sent Haddad an inspection report detailing 121 violations of the State Sanitary Code and describing evidence of lead paint on the premises. Later that year, the same inspector revisited the premises and discovered that most of the previously identified defects remained, and that nine new violations of the sanitary code were present. Haddad received this report as well.

$250 per month.[2]

Shortly after moving in, Gonzalez began complaining to Haddad about the condition of the apartment, particularly about the lack of adequate heat. Haddad suggested in response that Gonzalez and her family turn on her oven and stove burners for heat. After further complaints, Haddad provided Gonzalez with a small space heater that caused a fuse to blow and resulted in a temporary interruption of electrical service to the apartment. On another occasion, Haddad told Gonzalez that if she were cold, he would "come over at night and give her heat." Gonzalez took this remark to mean that Haddad wanted to sleep with her; and she became frightened, because Haddad in the past had used his pass key to enter her apartment without knocking.

In March, 1983, Gonzalez made a partial payment of rent. Several days later, Haddad requested the balance, and Gonzalez informed him that she was withholding further payments of rent until Haddad dealt with some of the problems with her apartment. Haddad then commenced his action for summary process, and Gonzalez filed her counterclaims. While the matter was pending, Haddad did send some repairmen to the apartment, but the repairmen often were drunk. During one such visit, one of the repairmen vomited into Gonzalez's kitchen sink, and she was forced to clean up after him. In addition, Haddad harassed and threatened Gonzalez. He would scream at her and look at her menacingly. Haddad told Gonzalez that she would lose in court because he would "buy" the judge. He also told her that he would report her nonpayment of rent to the welfare department so as to cause the termination of her benefits, and he threatened to have her sent back to Puerto Rico.

In May, 1983, the parties agreed that Haddad would eliminate certain sanitary code violations, and the agreement was approved as an order of the Housing Court judge. In June, Gonzalez filed a motion for contempt, alleging that the re-

---

[2]The parties stipulated at trial that the fair market value of the apartment without material defects was $375.

pairs had not been made. In July, 1983, the judge ordered an inspection of the premises and ordered Haddad to repair any defects found. In August, after a dispute arose over the condition of the premises as described by the inspector, the judge viewed the premises.

After his view, the judge made express findings. Among other defects, the judge found that: (1) there was no functioning heating system; (2) several basement windows were missing; (3) the apartment windows were in deplorable condition and without screens; (4) ceiling fixtures were missing; (5) the walls and ceilings were cracked and had holes; (6) doors were missing knobs; (7) the flooring in places was hazardous; and (8) the apartment was infested with cockroaches and rodents.[3] The judge ordered Haddad to repair most of the defects by August 22, 1983. He also ordered Haddad to install a heating system by September 15, 1983, and to have the apartment treated by a professional exterminator.

In late August, 1983, an inspector reinspected the apartment in the presence of both parties. The inspector found that virtually all of the defects identified by the judge remained unrepaired. Later that month, the Boston inspectional services department served Haddad with three separate notices of violations of State and city housing regulations related to the condition of Gonzalez's apartment. On September 9, 1983, the inspector again made an inspection of the premises and reported that unrepaired defects remained. Gonzalez moved out of the apartment on September 15, 1983.

Based on the findings, as summarized above, the judge found in favor of Gonzalez on each of her counterclaims. To avoid awarding cumulative damages, however, the judge dismissed all but the retaliation and c. 93A counterclaims.

On Gonzalez's counterclaim alleging retaliation in violation of G. L. c. 186, § 18, the judge found that Haddad's

---

[3]On this point, the judge found that "[t]he infestation of cockroaches. and rodents was so severe that the cockroaches would find their way into [Gonzalez's] refrigerator and eat her food and the rodents would chew her clothing."

attempt to evict Gonzalez was motivated solely by a desire to retaliate against her for her efforts to get him to repair her apartment. On the G. L. c. 93A counterclaim, the judge found that Gonzalez had suffered two discrete injuries as a consequence of Haddad's unfair and deceptive trade practices: emotional distress, and the diminution in value of the apartment due to Haddad's breach of the warranty of habitability.

On the emotional distress counterclaim, the judge determined that Gonzalez had proved that Haddad's intentional and outrageous conduct had caused her to suffer severe emotional distress, and that such proof constituted a basis for recovery under c. 93A. The judge then placed a value of $18,000 on Gonzalez's emotional distress. As to the warranty of habitability counterclaim, the judge reasoned that Gonzalez was entitled to the difference between the actual value of the apartment in its defective condition and the fair market value of the apartment (rather than the contract rent), and he calculated the extent of her damages on that theory accordingly. The judge then added both base awards, trebled the total, and subtracted rent withheld by Gonzalez. The judge later added to this award, an award of attorneys' fees and costs.

Against this background, we consider the specific issues raised by Haddad.[4] Additional facts appear below in relation to our discussion of some of these points.

---

[4]There has been some delay in the perfection of the appeal which appellate counsel for Gonzalez attributes to Haddad and makes the basis of an argument that we dismiss his appeal because he did not file a timely notice of appeal and did not seasonably comply with the rules of appellate procedure set forth in Mass. R. A. P. 8 (b) (3) (ii), as amended, 388 Mass. 1006 (1983), for the preparation of a transcript from electronically recorded proceedings, and Mass. R. A. P. 9 (c) (1) and (2), as amended, 378 Mass. 935 (1979), for assembly of the record. Similar arguments in support of a motion to dismiss the appeal were made by counsel for Gonzalez to the trial judge, who rejected them. The judge ruled correctly. As to the seasonableness of the appeal, Haddad filed a timely notice of appeal from the determination made by the judge on May 31, 1988, pursuant to Mass. R. Civ. P. 54 (b), 365 Mass. 820 (1974). That determination was designed to end confusion about whether an appealable judgment had been entered,

1. *Recusal.* Haddad's summary process action against Gonzalez was one of nine ongoing separate actions between Haddad and individual tenants in the same group of properties. At least some of the other cases were heard before the same judge of the Housing Court. After the trial of the first case,[5] Haddad twice made motions for the judge to recuse himself from the Gonzalez case on the ground that the judge was personally biased against Haddad.

Haddad argues that the judge erred in refusing to recuse himself. In support of his claim of bias, Haddad cites several comments from the record of the Rivera trial, see *supra* note 5, which ended six months prior to the trial in this case.[6] Haddad cites excerpts from the Housing Court judge's deci-

---

and we conclude that, at least in the circumstances of this case, Haddad's prompt filing of a notice of appeal after the docketing of the judge's rule 54 (b) determination satisfied his obligation to appeal in a timely manner. The delay in obtaining transcripts of the electronically recorded proceedings did not violate any aspect of Mass. R. A. P. 8 (b) (3) or 9 (c) (1) and (2), and we agree with the judge that the delay, and other reasons referred to by Gonzalez, provided no basis to dismiss the appeal.

[5]The case was a summary process action by Haddad against Luis Rivera who lived in the same building as Gonzalez.

[6]Haddad refers to three exchanges between the judge and counsel for Haddad in the Rivera trial which allegedly show bias. The first took place during Haddad's cross examination of a witness testifying as to the fair market value of Rivera's apartment:

THE COURT: "All this is wasted time. If we reach the point of attorneys' fees, your client is not only going to pay for you but he's going to pay the other side. If you took a minute and asked your client, 'Do you dispute any of the testimony given by this witness,' I feel his answer is going to be no."

COUNSEL FOR HADDAD: "I think that there's a substantial issue as to whether [the witness] is qualified to give an opinion on anything and that's why I'm trying to explore."

THE COURT: "Is there any dispute, Mr. Haddad — Mr. Haddad, will you please stand up?"

HADDAD: "Yes, sir."

THE COURT: "We were out at this building in August of 1983. Is there any dispute that the place was a dump?"

HADDAD: "No."

THE COURT: "No. Everyone agrees that it was a dump."

The judge then continued speaking with Haddad in order to attempt to establish the fair market value of Rivera's apartment. Haddad did not dispute the judge's figures. Haddad also cites as evidence of bias this exchange which immediately followed:

sions in both the Rivera and Gonzalez cases, as well as the findings from the view the judge took of Gonzalez's apartment, as further evidence of disqualifying bias.[7] Haddad argues that the judge's statements and comments reflect longstanding personal animosity toward Haddad, and that the judge should have disqualified himself under S.J.C. Rule 3:09, Canon 3 (C) (1) (a), 386 Mass. 811 (1981).

---

THE COURT: "My impression about this whole trial has [sic] it's been a big waste of everyone's time."

COUNSEL FOR HADDAD: "That may be, but we're here."

THE COURT: "I asked a long time ago whether there's going to be any dispute about the condition of the building. You said there was serious disputes about the condition of the building. I've been out to the building in 1983. I was out to it recently, and I don't think there's any dispute about the condition of the building — any genuine dispute about the basic condition of the property."

The judge went on to voice his opinion that it would take hours of testimony to cover issues which should have been settled by stipulation.

Haddad also refers to the following statement from the Rivera case, a response to repeated objections and a refusal by Haddad's counsel to stipulate to the chain of custody of an asbestos sample, as evidence of bias on the part of the judge:

THE COURT: "You know, if you lose this case, when it's all over, when I'm tacking up attorney's fees, you're going to pay $10,000 for objections. At least give him a chance to finish his question. How can I rule on an objection when I don't even know what the question is? This is not a jury trial. Go ahead."

[7]Haddad complains that the judge's decision in the Rivera case described Haddad's building as being "in deplorable condition" and containing "serious" code violations "which materially endanger the health and welfare of his tenants." The judge characterized Haddad as not "credible" and as making repairs only when forced to do so "kicking and screaming." The judge also found that it was "reasonable to infer that Haddad's initial objective was to 'bleed' the properties as long as possible without any regard whatsoever for the health, safety and wellbeing of his tenants."

Haddad also complains that the judge, in his decision in this case, described the building as "deplorable," as "one of the worst slums the Court has viewed over the past decade," and as "not fit for the housing of livestock." These observations appear to be based on both trial testimony and on the judge's August 17, 1983, view of the premises. The judge concluded that "the property probably contains hundreds of violations," and again characterized Haddad as not "credible." In connection with Gonzalez's chapter 93A action, the judge, quoting precedent, characterized Haddad's conduct as "immoral, unethical, oppressive," and "unscrupulous."

The matter of recusal is generally left to the discretion of the trial judge, see *Care & Protection of Martha*, 407 Mass. 319, 329 n.10 (1990); *Fogarty* v. *Commonwealth*, 406 Mass. 103, 111 (1989), and an abuse of that discretion must be shown to reverse a decision not to allow recusal. Although we disapprove of some of the statements the judge made during the Rivera trial, we do not find that he abused his discretion in not recusing himself from the Gonzalez case.

When faced with "a question of his capacity to rule fairly, the judge [must] consult first his own emotions and conscience." *Lena* v. *Commonwealth*, 369 Mass. 571, 575 (1976). In considering Haddad's motion for recusal, the judge appears to have done so.[8] Even though he concluded that he did not lack the capacity to act fairly and impartially, the judge was then required to attempt an objective appraisal of whether this was a proceeding in which "his impartiality might reasonably be questioned." *Id.*, quoting S.J.C. Rule 3:09, Canon 3 (C) (1), *supra*. Circumstances where a judge's impartiality might reasonably be questioned include instances where the judge "has a personal bias or prejudice concerning a party. . . ." S.J.C. Rule 3:09, Canon 3 (C) (1) (a), *supra*.

We address first the contention that the statements made during the Rivera trial are an indication that the judge harbored personal bias or prejudice against Haddad in the Gonzalez case. We think that the judge's expressions of opinion relied upon by Haddad are primarily indications of impatience rather than bias. By the time the Rivera trial commenced, the judge had already visited Haddad's building twice in his judicial capacity. The judge was quite familiar with the condition of the premises, which was open and obvious, and he apparently expected the parties to stipulate to

---

[8]In two orders regarding Haddad's motions that he disqualify himself, the judge noted that he had examined his own conscience and found no personal bias requiring him to recuse himself.

certain matters. The judge's expressions in the Rivera case,[9] despite our clear disapproval of them, did not necessarily indicate a lack of his capacity fairly and impartially to decide the issues in this case. See *Harris* v. *Board of Trustees of State Colleges*, 405 Mass. 515, 528 (1989); *King* v. *Grace*, 293 Mass. 244, 247 (1936). The three isolated statements of the judge, when viewed in the context of a fourteen-day trial, do not support a claim of bias disqualifying him from all future cases involving the same landlord.

Haddad claims that the strong language used by the judge in the Rivera decision, see *supra* note 7, demonstrates bias. The poor condition of both the building and Rivera's apartment appears to have led the judge to develop a negative opinion of Haddad's building and his performance as a landlord. The emergence of such an opinion during the Rivera case, however, did not necessarily give rise to a necessity for disqualification in the subsequent Gonzalez case. "[T]he judge acquired his opinion of [Haddad and the property] in his judicial role and not from an extrajudicial source. This factor weighs heavily in favor of the judge's decision not to disqualify himself." *Commonwealth* v. *Dane Entertainment Servs.*, 18 Mass. App. Ct. 446, 450 (1984).

Haddad also points to what he asserts is harsh language in the Gonzalez decision, see *supra* note 7, second paragraph, as evidence of personal bias. The decision is based in part, in addition to testimony from the trial, on the judge's findings from his view of the premises. The view was taken during Gonzalez' tenancy and included her apartment and the common areas of the building. Any negative impressions of Haddad or the building that the judge may have developed as a result of this view were formed in connection with the case. In order for "bias and prejudice to be disqualifying," however, "[it] must rise from an extrajudicial source and not from something *learned from participation in the case.*"

---

[9]Haddad does not point to anything in the transcript of the Gonzalez case to support his claim of personal bias. All statements which Haddad cites as evidence of bias are from the Rivera trial.

*Martha, supra,* at 329 (emphasis in original). "No doubt the judge in the course of the proceedings below formed a negative impression of [Haddad], . . . based on his appraisal of [Haddad and the building]. But that is not a ground for . . . a disqualifying bias." *Perez* v. *Boston Housing Auth.*, 379 Mass. 703, 740 (1980).

We find no indication that the judge below had a personal bias against Haddad that required that he recuse himself. We therefore cannot say that the judge abused his discretion in denying Haddad's motions to recuse himself from this case.

2. *Recovery for intentional infliction of emotional distress under G. L. c. 93A, § 9.* Prior to 1979, G. L. c. 93A, § 9 (1), provided in relevant part: "Any person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property . . . as a result of . . . an unfair or deceptive act or practice . . . may . . . bring an action . . . for damages." In a case arising under this provision, we held that a trial judge had correctly dismissed claims based on allegations of severe emotional distress, where there was no loss of money or property. See *Baldassari* v. *Public Fin. Trust*, 369 Mass. 33, 44-46 (1975). Accord *Wolfberg* v. *Hunter*, 385 Mass. 390, 396-397 (1982). Our decision in *Baldassari* was compelled by the language of § 9, requiring a "loss of money or property," but we acknowledged that the plaintiffs had alleged clear, serious, nonvicarious[10] violations of c. 93A, and that our disposition of the case was not entirely satisfactory. See 369 Mass. at 34, 44-46.

In 1979, in what appeared to be, "in part, a reaction to the restrictiveness of our holding in *Baldassari* . . ." (see *Leardi*

---

[10]Nonvicarious was used in this context to mean an action by a plaintiff who asserts that he has suffered direct harm as a result of a defendant's violation of G. L. c. 93A, as distinguished from an action brought by a plaintiff who asserts that he has not been directly harmed but who seeks (vicariously) to redress alleged violations of G. L. c. 93A that may have caused injury to others.

v. *Brown,* 394 Mass. 151, 158 [1985]), the Legislature amended § 9 (1), and deleted the "loss of money or property" requirement. See St. 1979, c. 406, § 1. Section 9 (1), as amended, provides in pertinent part as follows: "Any person . . . who has been injured by another person's use or employment of any method, act or practice declared to be unlawful by section two . . . may bring an action . . . for damages . . . ." The present case arises under the amended version of § 9; therefore, in a new context we confront an old question, namely, whether recovery for the intentional infliction of severe emotional distress is possible under G. L. c. 93A, § 9.

(a) In *Leardi* v. *Brown, supra* at 158-159, we held that, under the amended version of § 9 (1), the invasion of any legally protected right was compensable. In *Maillet* v. *ATF-Davidson, Co.,* 407 Mass. 185 (1990), we clarified that this included invasions in the form of injury to the person. See *id.* at 192. Because severe emotional distress is a form of personal injury, see *Simon* v. *Solomon,* 385 Mass. 91, 95, 111 (1982), it would seem to follow that it also is compensable under § 9, if the injury is the product of a violation of G. L. c. 93A, § 2.

Haddad contends that the only effect of the 1979 amendment was the expansion of the class of persons who could recover c. 93A damages. Haddad is correct that the amendment did enlarge the class of persons who could sue under § 9 to include claimants other than those in privity with the defendant. See *Van Dyke* v. *St. Paul Fire & Marine Ins. Co.,* 388 Mass. 671, 675 (1983). This was not, however, the only effect of the amendment. In fact, as we indicated in the *Maillet* decision, in light of the amendment, the invasion of any legally protected interest of another (including injury to the person) may be compensable under § 9. See 407 Mass. at 192, citing *Leardi* v. *Brown,* 394 Mass. 151, 157-158 (1985). The 1979 amendment thus broadened the class of persons who could prosecute claims under G. L. c. 93A, and at the same time enlarged the set of damage types compensable under the statute.

Moreover, assuming that (as Haddad asserts) the Legislature intended by the 1979 amendment to discourage vicarious suits by self-constituted attorneys general (consistent with the desire of the principal drafter of the original version of § 9), that intent is in no way frustrated by permitting recovery for the intentional infliction of emotional distress under c. 93A. Such an injury is clearly not vicarious. See *Baldassari* v. *Public Fin. Trust*, 369 Mass. at 46. The potential for frivolous c. 93A suits based on this theory is therefore, no greater than in the context of a common law action for intentional infliction of emotional distress.

Haddad further argues that principles of statutory construction require the conclusion that the Legislature did not intend to authorize recovery for emotional distress under c. 93A. Haddad starts with the established rule that legislative intent must be considered in relation to the main object that the statute was intended to accomplish. See, e.g., *Hanlon* v. *Rollins*, 286 Mass. 444, 447 (1934). Haddad then identifies the objectives of § 9 by reference to cases and commentary discussing the preamendment version of the section. See *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621 (1978); *Slaney* v. *Westwood Auto, Inc.*, 366 Mass. 688 (1975); Rice, New Private Remedies for Consumers: The Amendment of Chapter 93A, 54 Mass. L. Q. 307 (1969). We are not concerned here with that version of § 9, however, so these authorities do not aid Haddad at all. Moreover, as has been noted above, the more recent cases (as well as commentaries) construing the amended version of § 9 view the 1979 amendment as at least partly a response to the harsh result of *Baldassari* (see *Leardi* v. *Brown, supra* at 158, and commentaries cited), and as generally expanding the scope and remedial effect of § 9. See *Maillet* v. *ATF-Davidson, Co., supra* at 190-192. We perceive no necessary clash between recovery for emotional distress under c. 93A, and the apparent objectives of the statute in its present form.

Haddad also contends that provisions of § 9 (3) evidence a legislative intent that emotional distress damages are not recoverable under c. 93A. Haddad refers to the following lan-

guage: "recovery [for a successful plaintiff] shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation . . . ." Haddad asserts that emotional distress damages are consequential, rather than actual, and that the absence of a reference in § 9 (3) to consequential damages indicates that the Legislature did not intend that such damages be recovered, or doubled or trebled. We disagree.

In the first place, the plain statutory language quoted above refers to actual damages as compared to nominal damages of twenty-five dollars. This juxtaposition suggests a contrast between compensatory (i.e., actual) and nominal (i.e., twenty-five dollars) damages. Consonant with this view, we have said that actual damages in this context consist of all damages foreseeably flowing from an unfair or deceptive act or practice. See *DiMarzo* v. *American Mut. Ins. Co.*, 389 Mass. 85, 101 (1983). See also *Brown* v. *LeClair*, 20 Mass. App. Ct. 976, 979 (1985); Alperin & Chase, Consumer Rights and Remedies § 134 (1989). The decisions of other courts construing the same term in similar consumer protection statutes are in accord. See *Rollins, Inc.* v. *Heller*, 454 So. 2d 580, 585 (Fla. App. 1984) (actual damages as used in unfair and deceptive trade practices act include those recoverable at common law); *Payne* v. *Holiday Towers, Inc.*, 283 S.C. 210, 216 (1984) (same); *Bank of New Orleans & Trust Co.* v. *Phillips*, 415 So. 2d 973, 976 (La. App. 1982) (actual damages as used in unfair and deceptive trade practices act include humiliation and mental anguish); *Brown* v. *American Transfer & Storage Co.*, 601 S.W. 2d 931, 939 (Tex.), cert. denied, 449 U.S. 1015 (1980) (actual damages as used in deceptive trade practices act include damages [including mental suffering] recoverable at common law). Compare *Venes* v. *Professional Serv. Bureau*, 353 N.W. 2d 671, 674-675 (Minn. App. 1984) (actual damages as used in fair credit reporting act include mental anguish and suffering);

*Rasor* v. *Retail Credit Co.*, 87 Wash. 2d 516, 527-530 (1976) (same).

Beyond this reading of § 9 (3), Haddad's construction of § 9 (3) is at odds with the development of § 9 as a whole. Before the 1979 amendment, a loss of money or property was required before an action could be maintained. At that time, therefore, actual damages necessarily could consist only of pecuniary losses. The requirement of a loss of money or property was eliminated by the 1979 amendment, however, and § 9 (3) must be read in light of that change. Thus, in *Maillet* v. *ATF-Davidson Co.*, *supra*, we held that damages due to personal injuries are recoverable under c. 93A. To construe § 9 (3) as Haddad does is effectively to reinstate the requirement of a pecuniary loss that the Legislature deleted in 1979.

Haddad next characterizes Gonzalez's damages as merely "subjective," and argues that such damages are so problematic that the Legislature could not have intended to allow recovery for them under c. 93A when it amended the statute. This argument is unpersuasive. We see no reason to read § 9 as excluding recovery for damages that are fully proved, even so-called "subjective" damages. We agree with the view of courts of other jurisdictions that have considered similar arguments in analogous circumstances and have held that such damages are recoverable as actual damages. See *Pope* v. *Rollins Protective Serv. Co.*, 703 F.2d 197, 204-205 (5th Cir. 1983); *Muzelak* v. *King Chevrolet, Inc.*, 368 S.E.2d 710, 715-716 (W. Va. 1988). Compare *Millstone* v. *O'Hanlon Reports, Inc.*, 528 F.2d 829, 834-835 (8th Cir. 1976); *Collins* v. *Retail Credit Co.*, 410 F. Supp. 924, 932 (E.D. Mich. 1976); *Bank of New Orleans & Trust Co.* v. *Phillips*, *supra* at 976; *Creditors Protective Assoc., Inc.* v. *Britt*, 58 Or. App. 230, 233-234 (1982); *Rasor* v. *Retail Credit Co.*, *supra* at 527-528; *Chomicki* v. *Wittekind*, 128 Wis. 2d 188, 200-202 (1985).

Finally, Haddad makes what amounts to a multi-faceted policy argument against recovery of multiple damages for emotional distress under c. 93A. We respond to what appear

to be his major points. First, the possibility of recovery of multiple damages for the intentional infliction of emotional distress under c. 93A would not exceed the scope of the initial legislative policy decision behind c. 93A. It is established that deterrence is an important goal of the multiple damages provisions of c. 93A, including within the landlord and tenant context. See *McGrath* v. *Mishara*, 386 Mass. 74, 85 (1982). The interest in deterrence would be well served by the possibility of landlord liability for multiple damages for the intentional infliction of emotional distress. Therefore, the possibility of such liability in fact would advance this c. 93A policy goal.

Nor are we concerned that the right to recover for the intentional infliction of emotional distress under c. 93A might result in a flood of litigation. This is the first such claim to reach an appellate court since the 1979 amendment of the statute, a fact which tends to suggest that this issue is not often advanced successfully. Plaintiffs alleging the intentional infliction of emotional distress in c. 93A actions still must satisfy all of the jurisdictional requirements of the statute, and still must carry the difficult burden of proof applicable to all intentional infliction of emotional distress claims.

The likelihood that a finding of intentional infliction of emotional distress as a c. 93A violation will result in multiple damage awards pursuant to § 9 (3) is also no reason to bar such recovery. Such is the case in any intentionally wrongful act in violation of G. L. c. 93A, § 2. If a plaintiff's proof in a c. 93A action includes proof of intent as part of an underlying theory of liability, that proof may satisfy the wilful-or-knowing requirement for an award of multiple damages under § 9 (3). Cf. *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. 760, 780 (1986); Gilleran, The Law of Chapter 93A, 358 (1989). If a judge finds such to be the case, then the statute provides that the plaintiff is entitled to multiple damages. There is no logical or statutory basis for treating one form of intentional wrong committed in violation of c. 93A differently from any other such wrong.

Haddad's remaining policy-based arguments are not persuasive and require no separate discussion. All his arguments made in this connection are more appropriately addressed to the Legislature than to this court. We conclude that, in appropriate circumstances, tenants may recover multiple damages for the intentional infliction of emotional distress under c. 93A. We now consider whether those circumstances are present in this case.

(b) (i) Haddad's first argument is that his alleged comments and conduct toward Gonzalez do not support recovery at common law for intentional infliction of emotional distress. We disagree. The judge expressly found that Haddad knew, or should have known, that severe emotional distress was the likely consequence of his conduct; that Haddad's conduct was beyond all bounds of human decency; that Haddad's conduct caused Gonzalez emotional distress; and that Gonzalez's emotional distress was extreme and severe. See *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976). These findings were supported by the evidence, and we cannot say that they were clearly erroneous. See Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974).

Moreover, we agree with the judge's legal conclusion that Gonzalez's proof satisfied all the *Agis* requirements in this case. Haddad offered to rent Gonzalez an apartment that was essentially uninhabitable; Gonzalez moved in only after Haddad's agent told her that repairs would be made. The apartment had many defects, including non-functioning heat, peeling lead paint, broken windows and doors, hazardous flooring, irregular hot water, cockroaches, and rodents. Gonzalez's requests for repairs were largely ignored. On those occasions when repairmen were dispatched to the apartment, they were drunk. When Gonzalez attempted to assert her rights, Haddad commenced eviction proceedings, then disregarded repeated court orders to repair the apartment. In addition to the above, Haddad's conduct toward Gonzalez personally was offensive in the extreme. Haddad subjected Gonzalez to sexual and other harassment. Haddad also threatened to interfere with her status as a welfare recipient,

and to influence unfairly the outcome of the court proceedings between them.

As a consequence of this conduct, Gonzalez became frightened of Haddad, and she felt "angry, alone, helpless . . . withdrawn . . . [and] spent extended periods alone in her room, often crying." Gonzalez also experienced "various physical pains which may be reasonably attributable to the tensions and stress caused by her living conditions." In these circumstances, and with particular reference to Haddad's personal conduct towards Gonzalez involving sexual harassment and other threatening conduct, all of which was designed to discourage her from making efforts to obtain relief, the judge was justified in concluding that Gonzalez had made out a common law case of intentional infliction of emotional distress. Compare *Simon* v. *Solomon, supra* at 95-98; *Boyle* v. *Wenk*, 378 Mass. 592, 593-597 (1979).

(ii) Haddad's second contention is that only emotional distress accompanied by physical injury can be compensable under § 9, and that Gonzalez sustained no physical injury. Therefore, he asserts, the judge erred in awarding Gonzalez emotional distress damages. Again, we disagree.

Gonzalez was not required to prove that she had sustained physical injury to prevail on this counterclaim. As noted above, the elements of a cause of action for intentional infliction of emotional distress include: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; . . . (2) that the conduct was 'extreme and outrageous' . . .; (3) that the actions of the defendant were the cause of the plaintiff's distress; . . . and (4) that the emotional distress sustained by the plaintiff was 'severe'. . . ." *Simon* v. *Solomon, supra* at 95, quoting *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 144-145 (1976). Contrast *Payton* v. *Abbott Labs*, 386 Mass. 540 (1982) (negligent infliction of emotional distress); *Brown* v. *LeClair*, 20 Mass. App. Ct. 976 (1985) (same). There is no requirement of physical injury in common law intentional infliction of emotional distress cases, and we see no reason to create such a require-

ment for purposes of c. 93A actions. The judge therefore correctly awarded Gonzalez damages under c. 93A for her emotional distress.[11]

3. *Measure of damages for breach of warranty of habitability*. On the counterclaim of Gonzalez for breach of warranty of habitability, the judge concluded that Gonzalez was entitled to the difference between the actual value of the apartment in its defective condition and the fair market value of the apartment (which the parties stipulated was $375 per month). Haddad argues that the measure of damages for his breach of the warranty should have been the difference between the agreed rent ($250 per month), and the actual value of the apartment.

The judge applied the correct measure of damages. Cases discussing the measure of damages for breach of the common law warranty of habitability hold that the tenant's damages are to be measured by the difference between the value of the dwelling as warranted (the agreed rent may be used as some evidence of this value) and the value of the dwelling unit as it exists in its defective condition.[12] See, e.g., *Boston Housing Auth.* v. *Hemingway*, 363 Mass. 184, 203 (1973); *Darmetko* v. *Boston Housing Auth.*, 378 Mass. 758, 761 n.4 (1979); *Wolfberg* v. *Hunter*, *supra* at 399; *McKenna* v. *Begin*, 3 Mass. App. Ct. 168, 170-171 (1975).

The fact that Gonzalez agreed to pay less for the apartment than its full value as warranted is not controlling. The rule for computation of damages in this area gives a tenant no more than the benefit of the bargain because the implied warranty of habitability is part of the bargain. A landlord cannot nullify the implied warranty of habitability on a

---

[11]In view of our disposition of this issue, we need not consider Haddad's related arguments that the judge erred in admitting incompetent testimony on the question of physical injury, and that the judge's finding that Gonzalez suffered physical injury was clearly wrong.

[12]The *Wolfberg* case is not to the contrary. In *Wolfberg*, the rental value of the unit as warranted was found to equal the agreed rent so there was no need to distinguish between the two figures to determine the award of damages in the case.

dwelling by giving his tenant a discount in rent. See *Hemingway*, *supra* at 199; *Leardi* v. *Brown*, *supra* at 156; *McKenna* v. *Begin*, *supra* at 170-171. Gonzalez agreed to rent an apartment that complied with the State Sanitary Code, worth $375 per month, and she was entitled to damages that gave her the benefit of her bargain.

4. *Clerical error in calculation of damages.* Haddad asks us to correct a clerical error made by the judge in calculating damages for the breach of the warranty of habitability. The judge found Gonzalez was entitled to damages for a period of January 15, 1983, through September 15, 1983, the eight months of her tenancy. Damages, however, were calculated for nine months.

The judge found that the actual value of the apartment from January 15, 1983, to August 15, 1983, was zero, and that the value for August 15, 1983, to September 15, 1983, was $75. Damages were calculated to be $375 per month from January 15 to August 15 (seven months), which was multiplied by eight months rather than seven. The judge added $300 for the month ending September 15 (because Haddad had made some repairs), for a total of $3,300. That figure was trebled under G. L. c. 93A. Because the judge found that the tenancy lasted only eight months, damages should have been calculated only for that period. Haddad is entitled to a reduction in damages in the amount of $1,125, which represents damages for one month trebled.

5. *Disposition.* The judgment is modified to award Gonzalez damages on her G. L. c. 93A counterclaim of $61,475, and as so modified, is affirmed. Gonzalez has requested an award of attorney's fees in connection with the appeal. She is entitled to such an award. See *Yorke Management* v. *Castro*, 406 Mass. 17 (1989). The matter of that award is to proceed in accordance with the directions stated in the *Yorke Management* opinion, *supra* at 20.

*So ordered.*

LYNCH, J. (dissenting in part, with whom Nolan and O'Connor, JJ., join). I disagree with the holding that the Consumer Protection Act, G. L. c. 93A (1990 ed.), may be invoked to double or treble damages for the intentional infliction of emotional distress. I respectfully dissent from that portion of the court's opinion.

The court correctly notes we have held that "under the amended version of § 9 (1) the invasion of any legally protected right [is] compensable." *Ante* 865. See *Leardi* v. *Brown*, 394 Mass. 151, 159 (1985). The infliction of emotional distress is a tort (in these circumstances) only when the plaintiff can demonstrate that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct. *Payton* v. *Abbott Labs*, 386 Mass. 540, 555 (1982). *Agis* v. *Howard Johnson Co.*, 371 Mass. 140, 145 (1976). In other words, for there to be the invasion of a legally protected right the plaintiff must establish that the defendant acted intentionally or knowingly.

If this standard sounds familiar, that is because it echoes the showing of a "willful or knowing" violation upon which c. 93A conditions the multiplication of damages. The statute provides, in relevant part, that damages for a successful petitioner "shall be . . . up to three but not less than two times [actual or nominal damages] if the court finds that the use or employment of the act or practice [complained of] was a willful or knowing violation of [c. 93A, § 2] . . . ." G. L. c. 93A, § 9 (3). The wilful conduct in this case is what makes the plaintiff's emotional distress compensable. If c. 93A is applied mechanically, therefore, once a plaintiff establishes that she is entitled to actual damages in this context, then ordinarily she also will have established — without more — that she is entitled to double or treble damages under the statute. As the court reads it, c. 93A will convert virtually every consumer's recovery for the intentional infliction of emotional distress into a recovery of multiple dam-

ages. This result disregards legislative intent, and frustrates the structure of the statute. Nevertheless, the court concludes that it is compelled by the plain language of c. 93A. I disagree.

"The general and familiar rule is that a statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Hanlon v. Rollins*, 286 Mass. 444, 447 (1934). Accord *Dighton v. Federal Pac. Elec. Co.*, 399 Mass. 687, 694 (1987); *G.J.T., Inc. v. Boston Licensing Bd.*, 397 Mass. 285, 293 (1986). Ordinarily, if the language of a statute is unambiguous, it is conclusive as to "the purpose of its framers." See, e.g., *Boston Neighborhood Taxi Ass'n v. Department of Pub. Utils.*, ante 686; *Hoffman v. Howmedica, Inc.*, 373 Mass. 32, 37 (1977). It is not the plain meaning of the statute, however, that drives the court to its conclusion, but the incremental logic of our own decisions superimposed upon the statutory language to achieve a result not contemplated by, and beyond the design of, the legislative enactment. Moreover, "time and again we have stated that we should not accept the literal meaning of the words of a statute without regard for that statute's purpose and history." *Sterilite Corp. v. Continental Casualty Co.*, 397 Mass. 837, 839 (1986), and cases cited. Accord *Quincy City Hosp. v. Rate Setting Comm'n*, 406 Mass. 431, 443 (1990).

The purpose of the multiple damages provision of c. 93A is no mystery. The provision reflects "the Legislature's displeasure with the proscribed conduct and its desire to deter such conduct and encourage vindicative lawsuits." *McGrath v. Mishara*, 386 Mass. 74, 85 (1982). According to the principal draftsman of the statute, the damages provisions of c. 93A are intended to remove economic disincentives to con-

sumer actions, which typically involve small dollar amounts. Rice, New Private Remedies for Consumers: The Amendment of Chapter 93A, 54 Mass. L.Q. 307, 317 (1969). Thus the statute provides for liquidated minimum damages and attorneys' fees as well as double and treble damages. C. 93A, §§ 9 (3) & (4). However, the multiplication of damages for the intentional infliction of emotional distress does not serve the purpose of transforming petty lawsuits into cost-justified ones. Because such damages are available only for severe emotional distress, *infra* at 13-15, *Payton*, *supra*, *Agis*, *supra*, such claims by definition are significant, and it is unnecessary to augment the damages to fulfil the aim of the provision.

Nor does the award of double or treble damages in this case fit the structure of c. 93A. The statute explicitly links liability for multiple damages to a degree of culpability greater than that which justifies the award of actual damages. See *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 853 (1983). Having won actual damages, c. 93A requires a petitioner to demonstrate an additional element, wilfulness or knowledge, to earn multiple damages. Today's ruling collapses the two findings into one.

This conflict with the structure of the statute is no mere technicality; it belies the fundamental illogic and unfairness of today's ruling. The statute permits the award of double or treble damages as a penalty for the defendant's wilfulness or knowledge in committing an unfair or deceptive act. *Id.* at 856. The award of actual damages for the intentional infliction of emotional distress also accounts for the perpetrator's state of mind. See *Payton*, *supra* at 547, 554-555. Thus, the reason for awarding double or treble damages is absent in this context because, with the award of actual damages, the defendant's culpable state of mind has already been penalized. The piling on of multiple damages without justification is, at the least, unfair.

Worse, it is unnecessary. The court's wooden rationale for multiplying damages in this case is, The statute says so. *Ante* 869-870. The opinion ignores the main objective behind the

multiple damages provision. The intent of the multiple damages provision of c. 93A was not to shower petitioners with damages for a culpable state of mind already compensated by the award of actual damages. I respectfully dissent.