WILLIAM J. MURPHY, JR., trustee,[1] & another[2] vs. THOMAS
MILLER (and a companion case[3]).

No. 08-P-1106.

Bristol. June 2, 2009. - September 22, 2009.

Present: CYPHER, McHUGH, & MILKEY, JJ.

*Housing Court,* Jurisdiction. *Landlord and Tenant,* Rent, Habitability, Quiet
enjoyment.

In two civil actions brought by a landlord against tenants for past rent due on
their cabins, a Housing Court judge properly retained jurisdiction over the
tenants' counterclaims, which were based on the substandard condition of
their premises, where G. L. c. 185C, § 3, expressly provided that the
Housing Court had jurisdiction, without qualification, over claims for
breach of a covenant of quiet enjoyment, and where claims for breach of
an implied warranty of habitability, which are also referenced in that
statute, were plainly of the kind that has long been recognized as within
the Housing Court's jurisdiction; further, there was no merit to the landlord's
argument that the closing of the cabins deprived the Housing Court of
jurisdiction over the counterclaims. [214-219]
This court declined to award attorney's fees or double costs pursuant to G. L.
c. 211A, § 15, and Mass.R.A.P. 25 to parties that were successful on
appeal on a jurisdictional issue, where the unsuccessful party's arguments
were not frivolous or advanced in bad faith; however, this court did award
attorney's fees and costs to one party who successfully defended her vic-
tory in the trial court. [219]

CIVIL ACTIONS commenced in the small claims session of the
Hingham Division of the District Court Department on July 19,
2004.

After transfer to the Southeast Division of the Housing Court
Department, the cases were heard by *Wilbur P. Edwards, Jr.,* J.

*Michael T. Sullivan* for William J. Murphy, Jr., & another.
*Ethan C. Stiles* for Thomas Miller & another.

[1]Of the Unicorn Realty Trust and of the 239 Washington Street Trust.
[2]Joseph D. McDonnell, trustee of the Unicorn Realty Trust.
[3]William J. Murphy, Jr., trustee, & another vs. Ellen Kilduff.

MILKEY, J. Through two actions filed in District Court, a landlord sought to collect $300 in past rent from one tenant, and $900 from another. Both tenants counterclaimed based on the substandard condition of their premises and had the cases transferred to Housing Court. After trial, the court entered judgments that required the landlord to pay the tenants a total of almost $30,000 in damages, attorney's fees, and costs. In these consolidated appeals, the landlord claims that the Housing Court lacked subject matter jurisdiction to hear the tenants' counterclaims. Specifically, the landlord argues that because the housing units had been closed before suit was filed (and were torn down shortly thereafter), there was no "present" housing problem necessary to supply the Housing Court with jurisdiction. Below, the tenants endorsed the landlord's position that jurisdiction was lacking, but the Housing Court nevertheless retained the case. We conclude that the court had jurisdiction, and we affirm.

*Background.* The plaintiffs in the underlying actions (collectively, the landlord) are the former owner and property manager of a now defunct campground in Norwell. Although the campsite portion of the property was occupied on a seasonal basis, the property also included twelve to fourteen year-round cabins that were rented by the week to long-term tenants. Thomas Miller had lived in one of the cabins since 1991, and Ellen Kilduff had lived in another since 1979. Each cabin contained multiple rooms of apparent Lilliputian scale.[4] By the end of their tenancies, Miller's rent was $150 per week, and Kilduff's was $135 per week.

The cabins were quite dilapidated, and Miller and Kilduff (collectively, the tenants) lived with an impressive array of housing problems since at least the late 1990's. Specifically, the trial judge found that the tenants had faced the following problems at various times during the course of their tenancies: septic system overflows; frozen water pipes; a ruptured gas line; lack of heat; low water pressure; insect and rodent infestation; rotten floors, frame, and exterior clapboards; broken front door and windows; extensive mold; leaky roofs; a leaking shower; and electrical problems.

By 2003, the landlord had decided to sell the property to a

---

[4]At trial, Miller described his cabin as containing a total of approximately 283 square feet, while Kilduff described hers as containing 300 square feet.

third-party developer who planned to tear down the cabins and construct thirty-nine condominium units in their place. On October 3, 2003, the zoning board of appeals of Norwell granted a permit for the development but conditioned its approval on the developer's paying $1,500 to each long-term tenant "to cover one month's rent at a new location, transportation and other miscellaneous moving expenses." That money was to be paid "[p]rior to ground disturbance."

With the cabins slated to be torn down to make way for the new development, the landlord terminated the tenancies in April and May of 2004. Neither of the tenants received his or her $1,500 for relocation expenses at that time, and payment of those expenses was still outstanding more than a year later.[5] As they prepared to leave their long-term residences unaided by that assistance, both tenants stopped paying their rent. Specifically, Miller ceased paying his rent as of May 16, 2004, and vacated his cabin two weeks later. Kilduff ceased paying her rent as of April 25, 2004, and vacated her cabin six weeks later.

Shortly thereafter, the landlord commenced separate small claims actions against the tenants in the Hingham Division of the District Court Department, seeking a total of $1,200 in unpaid rent.[6] At the request of the tenants, the actions were transferred from District Court to the small claims session of the Southeastern Division of the Housing Court Department, and from there to a civil session. See Rule 4(b) of the Uniform Small Claims Rules (2002); G. L. c. 185C, § 20; and G. L. c. 218, § 24. The tenants raised various defenses and counterclaims, mostly based on the substandard condition of the premises. These included claims for a breach of the implied warranty of habitability,[7] a breach of the

---

[5]Under the terms of the local approval, these expenses were owed by the developer, not the landlord. The developer refused to pay the money at the time of the move because "ground disturbance" had not yet commenced and payment therefore was not yet technically required. When payment still had not been made a year later, the tenants sought to implead the developer in the cases now under appeal. The Housing Court judge concluded that the court lacked subject matter jurisdiction over the tenants' claims against the developer.

[6]The landlord sought two weeks' unpaid rent from Miller and six weeks' unpaid rent from Kilduff, all at $150 per week. The record does not explain the discrepancy between the $150 rate the landlord sought from Kilduff and her actual rent of $135 per week.

[7]Although the tenants did not cite to the statute, claims for breach of an implied warranty of habitability are now codified at G. L. c. 239, § 8A.

covenant of quiet enjoyment pursuant to G. L. c. 186, § 14, violations of the security deposit law (G. L. c. 186, § 15B), and violations of G. L. c. 93A.[8]

At one of the hearings in Housing Court, the landlord asserted that the court lacked subject matter jurisdiction and moved orally to dismiss the counterclaims or to transfer them back to District Court. Because the tenants agreed that the Housing Court lacked jurisdiction, they submitted a memorandum of law in support of the landlord's oral motion. Nevertheless, the Housing Court judge denied the landlord's motion and retained the case.

After substantial pretrial skirmishing, both cases went to trial before the same judge. The judge ruled in favor of the landlord's claim for unpaid rent, and awarded the landlord a total of $1,190 in damages and costs. The judge also ruled in the landlord's favor on the tenants' security deposit and G. L. c. 93A counterclaims.[9] In addition, despite the manifest problems at Miller's cabin, the judge rejected his quiet enjoyment counterclaim because Miller had "testified that he was not bothered by the conditions at the Premises and that the conditions did not seriously interfere with his enjoyment of the Premises."[10] The judge did conclude that the substandard conditions at Miller's cabin constituted a breach of the implied warranty of habitability, and he ruled that Miller was entitled to a ten percent decrease in the fair market rental value (resulting in a total rent abatement of $4,740.10), plus costs of $890.07.

In Kilduff's case, the judge concluded that the substandard conditions at the premises constituted a serious and substantial interference with her quiet enjoyment in violation of G. L. c. 186, § 14. He therefore awarded her statutory damages of three

---

[8]The tenants' subsequent motions to add counterclaims for intentional infliction of emotional distress were denied, and the tenants have not appealed from the denial of those motions.

[9]The judge ruled that tenants failed to meet their burden of proof on the security deposit claims and on c. 93A claims that were based on the alleged security deposit violations. He also ruled that the other c. 93A claims were untimely. The tenants did not appeal the judgments, so these claims are not before us.

[10]This particular ruling, and many others evident throughout the record, demonstrate the care and even-handedness with which the judge approached the cases.

months' rent ($1,755), attorney's fees of $15,232.31, and costs of $506.85. The judge also concluded that Kilduff was entitled to a twenty percent decrease in the fair market rental value on the breach of the implied warranty of habitability (resulting in a total rent abatement of $7,507.50). After judgments were entered, the landlord filed timely appeals, which were consolidated.

*Discussion.* The sole question on appeal is whether the Housing Court had subject matter jurisdiction over the tenants' counterclaims pursuant to G. L. c. 185C, § 3, as amended through St. 2000, c. 159, § 246. Although the Legislature has expanded the court's jurisdiction over the years, "the Housing Court remains a court of limited jurisdiction." *LeBlanc* v. *Sherwin Williams Co.,* 406 Mass. 888, 896 (1990). On many occasions, the Supreme Judicial Court and this court have found jurisdiction wanting despite the "seemingly broad" language of the statute. See *id.* at 893, quoting from *Police Commr. of Boston* v. *Lewis,* 371 Mass. 332, 340 (1976). A typical example is *Isakson* v. *Vincequere,* 33 Mass. App. Ct. 281 (1992), which involved a homeowner's claim against a contractor who stopped work on a home addition in violation of his contract. The homeowner sought to recover the added expense of having to hire a second contractor to complete the work. After concluding that the homeowner's claim for money damages did not raise a "present problem related to housing," this court concluded that the Housing Court lacked jurisdiction. *Id.* at 285. Because the cabins in the instant case had been permanently closed before suit was filed, the landlord argues that the tenants' claims are just like the one in *Isakson* (a suit solely for money damages that did not involve a "present problem related to housing") and therefore must suffer the same fate. We reject that argument as unsupported by the case law, the language of the statute, and the legislative history.[11]

The language of G. L. c. 185C, § 3, is imprecise and more than a little ungainly.[12] In addition, the near-unbounded breadth of some of the statutory language fits uneasily with the more

---

[11]The fact that the parties below agreed that the court lacked jurisdiction is of no moment. Just as parties cannot supply subject matter jurisdiction by agreement, neither can they take it away.

[12]The key opening sentence is particularly difficult to parse, including as it does 319 words and thirty-six commas.

limited view of the court's jurisdiction revealed by the legislative history. See *LeBlanc* v. *Sherwin Williams Co.*, *supra* at 891-893. Not surprisingly, this has spawned a great deal of litigation over the precise extent of the court's jurisdiction. See *id.* at 893-895 (chronicling much of that history). In those battles, however, one point has been beyond dispute: the Legislature's central focus in creating the Housing Court was on providing a forum to address landlord-tenant disputes and cases involving minimum housing standards. See *Police Commr. of Boston* v. *Lewis*, *supra* (identifying cases dealing with "landlord-tenant relations" and ones dealing with "minimum housing standards" as among "the type of actions that the Legislature had in mind when establishing the Housing Court"). The claims that have been determined to fall outside Housing Court jurisdiction are ones that strayed too far from that original core mission.[13] Indeed, precedents have limited the Housing Court's jurisdiction, in part, so as to concentrate its finite resources on its primary mission. *Isakson* v. *Vincequere*, *supra* at 284, quoting from *Hass* v. *Breton*, 377 Mass. 591, 601 (1979) (rejecting interpretation that would threaten "to dilute the expertise of [the Housing Court] and to delay the resolution of disputes properly before it").

The case before us involves litigation between a landlord and tenant over the substandard condition of the rental premises. As such, it is the type of claim that lies at the heart of the Housing Court's jurisdiction. Indeed, G. L. c. 185C, § 3, expressly provides that court with jurisdiction over claims for breach of a covenant of quiet enjoyment without qualification.[14] Claims for breach of an implied warranty of habitability are quite similar

[13]See *Police Commr. of Boston* v. *Lewis*, *supra* at 332 (preliminary injunction requiring police to provide "24-hour security protection" for certain tenants in public housing); *LeBlanc* v. *Sherwin Williams Co.*, *supra* at 889 (claim against manufacturer for putting lead-based paint into marketplace); *Ryan* v. *Kehoe*, 408 Mass. 636, 636 (1990) (action to set aside fraudulent conveyances); *Isakson* v. *Vincequere*, *supra* at 281-282 (claim against contractor for failing to complete home addition).

[14]General Laws c. 185C, § 3, incorporates claims brought pursuant to a lengthy list of specifically-referenced statutes, but it does so in two markedly different ways. Many of the referenced statutes are incorporated in a limited manner. Specifically, the statute incorporates only "so much of" these provisions "as is concerned directly or indirectly with the health, safety, or welfare, of any occupant of any place used, or intended for use, as a place of human habitation. . . ." In this manner, the statute makes clear that not all claims

to quiet enjoyment claims,[15] they are also specifically referenced in the statute, and they are plainly the kind of landlord-tenant claim that has long been recognized as within the Housing Court's jurisdiction. See *Police Commr. of Boston* v. *Lewis*, 371 Mass. at 340; *Haddad* v. *Gonzalez*, 410 Mass. 855, 856 (1991).

We are not persuaded by the landlord's argument that the closing of the cabins deprived the Housing Court of jurisdiction over claims that were otherwise unquestionably proper. As an initial matter, we note that the landlord has not identified any language in G. L. c. 185C, § 3, that supports its interpretation. The statute broadly confers jurisdiction on the Housing Court to decide all civil actions "concerned directly or indirectly with the health, safety, or welfare, of any occupant of any place *used*, or intended for use, as a place of human habitation and the possession, condition, or use of any particular housing accommodations." G. L. c. 185C, § 3 (emphasis added). Unlike in *Isakson*, the housing conditions at issue here directly implicated the occupants' "health, safety or welfare" within the meaning of the statute.[16] Moreover, given that "used" can refer either to current or past use, there is nothing in the tense of that verb that compels an interpretation that housing problems must continue in order to supply jurisdiction. See *United States* v. *Rodriguez-Moreno*, 526 U.S. 275, 280 (1999) (cautioning against over-reliance on use of a "verb test" in statutory interpretation).

---

brought pursuant to those referenced statutes (or the catch-all provisions) may be brought in Housing Court. A small set of other statutory claims, including quiet enjoyment claims brought pursuant to G. L. c. 186, § 14, are referenced without any qualifying language, suggesting that no limiting gloss should be supplied.

[15]See *Jablonski* v. *Casey*, 64 Mass. App. Ct. 744, 747 (2005) (recognizing similarity between warranty of habitability and covenant of quiet enjoyment).

[16]*Isakson* v. *Vincequere*, 33 Mass. App. Ct. at 284, dealt with a homeowner's inconvenience at having to hire a second contractor, and the homeowner argued that this implicated his "welfare" within the meaning of the statute. We recognized that, under an expansive reading, any problem in any way related to housing could be said to affect an occupant's " 'welfare' in the broad and general sense of his happiness and emotional state of well being." *Ibid.* Nevertheless, we rejected that expansive reading and held that "[a]s used in G. L. c. 185C, § 3, . . . the words 'health, safety, or welfare' are to be construed narrowly in order to carry out the purpose for which the statute was enacted." *Id.* at 283-284. The significant housing problems at issue in this case easily fit within the narrow construction of "health, safety, and welfare" recognized by the *Isakson* decision.

Finally, the qualifying language just analyzed is not even implicated with regard to quiet enjoyment claims, in light of the fact that G. L. c. 185C, § 3, provides the Housing Court jurisdiction over such claims without qualification.[17]

In lieu of finding support in the language of the statute, the landlord rests largely on the fact that we rejected jurisdiction in *Isakson* after noting the absence of a "present" housing problem. In this manner, the landlord places undue import on that reference and takes it out of context. The full sentence states as follows:

> "Applying G. L. c. 185C, § 3, to the circumstances of the plaintiff's claim, we conclude that his action for money damages for a breach of contract which does not involve any present problem related to housing does not require the expertise of a specialized court."

*Isakson* v. *Vincequere*, 33 Mass. App. Ct. at 285. Certainly, as the quoted language suggests, the existence of a present housing problem is a relevant consideration in evaluating whether the Housing Court has authority to hear cases lying at the periphery of its jurisdiction. The language does not, as the landlord would have it, establish a per se rule that a "present housing problem" is a jurisdictional prerequisite. Moreover, by emphasizing that Housing Court jurisdiction should be found where the need for the court's expertise is implicated, the quoted passage supports jurisdiction here. The primary issues in dispute at trial concerned the significance of the property defects and sanitary code violations, the appropriate amount of damages for any diminution in value, and the seriousness of the interference with the tenancies. Such issues fell squarely within the Housing Court's area of

---

[17]See note 14, *supra. Police Commr. of Boston* v. *Lewis*, 371 Mass. at 334 n.3, could be taken to suggest that not all quiet enjoyment claims can be brought in Housing Court, because the court there found no jurisdiction despite the fact that the tenants' claims included a claim styled as one for a breach of a covenant of quiet enjoyment. A better reading of that case is that the court viewed the tenants' claim — which was brought against the Boston police for failing to provide adequate protection — as not properly brought under the quiet enjoyment statute. That would explain why the court analyzed the case under the "any other general or special law" language and not by reference to G. L. c. 186, § 14. See *Police Commr. of Boston* v. *Lewis, supra* at 336-337.

expertise. By contrast, in *Isakson*, "[t]here was no question concerning the condition of the premises." *Id.* at 284.

Our interpretation is reinforced by an examination of the legislative history on which *Isakson* and similar cases rely. The original Housing Court was created based on the recommendations of a special commission. *LeBlanc* v. *Sherwin Williams Co.*, 406 Mass. at 892. In its report to the Legislature, the special commission specifically concluded that the Housing Court should "have jurisdiction over every facet of landlord-tenant relations dealing with substandard dwellings." *Ibid.*, quoting from 1968 House Doc. No. 4498 at 16. Thus, the very legislative history on which courts have relied to construe the Housing Court's jurisdiction narrowly, counsels in favor of generously construing the court's jurisdiction as to those types of cases that fall within its core mission.

In addition, we note that the landlord's interpretation would create administrative headaches by requiring the Housing Court to scrutinize whether "present housing problems" continue to exist in any given case.[18] This in turn could add to the burdens on other courts to the extent that cases are transferred in midstream. We are loath to adopt an interpretation that creates such problems absent evidence that the Legislature intended such a result.

The parties have engaged in an interesting debate on whether the Housing Court's retention of this case helped, or hurt, the cause of improving housing conditions (one of the main goals behind creation of the court). The landlord argues that the court's keeping of the case prevented the court from addressing more pressing cases that involved ongoing housing conditions. The tenants counter that strict enforcement of the housing laws serves to deter housing violations generally, even if the specific housing at issue no longer exists. See *Police Commr. of Boston* v. *Lewis*, 371 Mass. at 338 (recognizing that one of key original roles envisioned for Housing Court was as "vigilant enforcer of the laws related to housing conditions"). We need not, and should not, attempt to resolve that debate. So long as we are satisfied that the court had jurisdiction, our job is not to second-

---

[18]Cognizant of such problems, the landlord seeks to limit its argument to the rare situation where the housing is permanently closed before suit is filed. We do not view the argument as so easily limited.

guess the judgment of Housing Court judges on how best to manage their docket and whether to retain a particular case.

Having concluded that the Housing Court had subject matter jurisdiction, we affirm the judgments. The tenants have requested that they be awarded attorney's fees and double costs. Although we reject the landlord's arguments, we do not find them frivolous or advanced in bad faith, and we therefore decline the tenants' request for attorney's fees and double costs pursuant to G. L. c. 211A, § 15, and Mass.R.A.P. 25, as amended, 378 Mass. 925 (1979).[19] Kilduff is, however, entitled to an appropriate share of her appellate fees and costs for successfully defending the victory on her quiet enjoyment claim brought pursuant to G. L. c. 186, § 14. See *Yorke Mgmt.* v. *Castro*, 406 Mass. 17, 19 (1989). Within fifteen days, Kilduff shall submit a statement of her attorney's fees and costs in accordance with the procedure specified in *Fabre* v. *Walton*, 441 Mass. 9, 10-11 (2004), and within fifteen days thereafter, the landlord may submit an opposition to the amount requested. See *Demoulas Super Mkts., Inc.* v. *Ryan*, 70 Mass. App. Ct. 259, 268-269 (2007).

*Judgments affirmed.*

---

[19]We also note that while the tenants on appeal seek to characterize the landlord's arguments as "discredited, intellectually bankrupt and reactionary," they endorsed those very arguments below.