Welch, J.
Chapter 93A, §9, the statute protecting consumers from unfair and deceptive business practices, is undoubtedly one of the more overused — and frequently misused — laws in the Commonwealth. Equally undoubted, however, is that the potent weaponry provided by Chapter 93A — including its treble damage provisions — is fully justified in the hopefully unusual case where a consumer is intentionally abused by unfair and deceptive trade practices. This is such a case.
First some background. This is an appeal from a District Court Judge’s finding that defendant Ira OldsToyota, a car dealership located in Danvers, Massachusetts, committed violations of c. 93A. The District Court awarded treble damages and attorneys fees.
The defendant appealed the adverse decision and a trial was held at the Superior Court level. Based upon the evidence heard at that trial, this Court also concludes that the dealership’s conduct constituted an egregious example of an unfair and deceptive trade practice conducted in bad faith.
The facts of this case would send a shiver up the spine of any new car buyer. The plaintiff is high school educated, black, and speaks English with a Haitian accent. He is not a sophisticated business person. In May of 1989, he purchased his first automobile. This was a new Toyota Corolla purchased from defendant Ira Olds-Toyota. The defendant paid $2,000 down on the car and signed a contract with Toyota Motor Credit Corporation to pay the remainder in installments. The car came with a manufacturer’s warranty and the plaintiff paid approximately $900 for an extended warranty. The parties agree that the car, at all relevant times, was within the warranty period and that any defects in workmanship or parts would be covered by this warranty.
In purchasing the car, the plaintiff dealt with a salesperson at the dealership by the name of Gus Kassis. That salesperson is no longer employed with the dealership. Upon purchasing the car, the salesman informed Mr. St. Phard that he should contact him if there were any problems with the car. The car performed flawlessly for approximately six months and the plaintiff made his installments payments on the car in a timely fashion. Throughout this period of six months, the plaintiff had no accidents in the car nor any other type of incidents with the car. As of December 24, 1989, the car had traveled approximately 13,000 miles. The plaintiff primarily used the car for commuting to work (at the Danvers State Hospital) and for transporting his family to church.
On December 24, 1989, the problems began. December 24 was a cold day. The plaintiff was getting his family ready to attend a Christmas Eve service at their church. At the time, the St. Phard family included an infant. Because of this, Mr. St. Phard wanted to warm the car up before having his family enter the car. After starting the car, Mr. St. Phard went back into his home. Approximately ten minutes after starting the car he heard the car engine racing loudly. Upon looking out at the car he noticed a large amount of smoke coming from the engine compartment of the car. Upon closer inspection he saw that the smoke was beginning to come through the dashboard into the passenger compartment. Mr. St. Phard desperately tried to turn off the vehicle by turning the key. The vehicle would not turn off by turning the key in the ignition switch. Mr. St. Phard thereupon ran into his home to call the Are department. He then told his family to leave the home and to stay far away from the car because he thought it was about to explode.
The Lynn Fire Department responded quickly to the scene. Lieutenant Lee Oliver was one of the members of the fire department to respond. He noticed the engine revving loudly and wildly. He also noticed smoke and steam coming out of the engine compartment. He attempted to shut the car off by turning the key in the ignition switch but, like Mr. St. Phard, was unable to. Then Lieutenant Oliver attempted to stall the car by “popping the clutch” of the vehicle. This was successful and the car stopped. The fire department officials then opened the engine hood of the vehicle and observed that the engine was veiy warm but that there was no fire. Lieutenant Oliver then instructed the fire department personnel to cut the cable that connected the battery to the engine. The usual practice of the Lynn Police Department is to cut the negative cable. This was done. In addition the fire department appears to have cut the positive cable plus some other wires located in the immediate vicinity of the positive wire cable. The reason for cutting the cables was to insure that the car would not restart by itself and pose a significant fire hazard. Lieutenant Oliver filled out a Massachusetts Fire Incident Report. That report sets forth that the car engine “would not shut off and engine overheated.” The report also notes “no fire — cut battery cable as precaution.”
On December 26, 1989, the next business day, Mr. St. Phard called up the defendant: Ira Olds-Toyota and asked for the salesman who sold him the car. He described the incident and told the salesperson that he wanted to have the car fixed. The salesperson asked him if he could drive the car to the dealership and Mr. St. Phard responded that he could not. As a result, Ira Toyota arranged for the car to be towed to the dealership on January 3, 1990. The defendant dealership paid for the towing of the vehicle. The vehicle was towed by Rod’s Towing Co. Mr. St. Phard authorized Ira to tow the car to the dealership. The defendant Ira arranged for the towing company. Rod’s Towing Co. towed the vehicle by hoisting the front end of the vehicle. See Exhibit 7. As is apparent from the condition of the tail pipe which was demonstrated in court, this towing from the front end resulted in the tail pipe scraping against the pavement and being compressed. This damage to the tail pipe occurred after the December 24 incident.
*125 Once the car had been towed to defendant Ira, Mr. St. Phard arrived at the service department portion of the dealership to sign the work order authorizing work on the car. At this time he apparently had a conversation with a Tracey Riordan, an assistant service manager. This conversation took place around or on January 3. As is evidenced by defendant’s Exhibit No. 6, Mr. St. Phard informed Ira Toyota of the December 24th incident. He stated that “warming up vehicle ten minutes, lots of smoke coming out of dash, fire department cut battery cable.” Also listed on the description was “took key out of ignition and car still ran.”[2]1 credit Mr. St. Phard’s testimony that he informed Ira Toyota at that time simply to fix the car and gave them a general authorization to do the repair work on the car. Indeed, Mr. St. Phard signed the work order in two places authorizing the dealership to do all necessary work without need of any further approval. At least a portion of the work order which bears Mr. St. Phard’s signature indicates the following: “You need not obtain approval from me for repairs or inform me prior to repairs what the repairs are or their cost if the total repairs does not exceed $_.” In the blank portion there simply exists a straight line. See Defendant’s Exhibit No. 6 (and the original of such exhibit). This Court interprets that provision as being a general authorization, as Mr. St. Phard testified, permitting the dealership to make all repairs necessary to fix the car.
Defendant Ira did not fix the car. Instead, Ira, knowing that the vehicle was under warranty and that the problem most likely was due to a mechanical defect (and thus covered by the warranty), simply quickly checked the engine and noticed no visible sign of fire damage. The personnel in the service department also noticed no smell of fire. They did notice the cut battery cables. Thereupon, their inspection ended. Of course, the fact that no fire damage was noted is not surprising because there never was an allegation of any fire damage. Indeed, Ira had been informed of precisely what the fire department had seen, namely smoke and steam (not fire) coming out of a engine compartment, an engine which was racing, and the inability to turn the car off by using the key in the ignition. The fact that Ira noticed cut battery cables also was not surprising since they already knew that the fire department had been called to the scene and had cut the battery cable themselves. No one at Ira got back in touch with Mr. St. Phard.
After two or three days passed, Mr. St. Phard called Ira and was told that Ira could not do anything on the car because it was not under the warranty. Instead, Ira recommended that Mr. St. Phard contact his car insurance company. This is the beginning of an attempt by Ira not to honor the warranty purchased by the plaintiff. The plaintiff already had provided full authority and authorization to defendant Ira to fix the car. As the then service manager, Mr. Ashley Cousins, testified, Ira’s general policy was to presume that a six-month-old car which had such a serious problem would be covered by the warranty. Yet, no such presumption applied to Mr. St. Phard’s vehicle. Instead, Ira only did a cursoiy examination and concluded that cut battery cables were not covered by the warranty. Such a conclusion was, putting it in the most generous light, inadequate and half-baked and, placing it in a more realistic light, such actions are evidence of a dishonest sham. This is because Ira already knew that the battery cables had been cut by the fire department because of a serious problem during which the motor was racing, over heating, and could not be shut off by the car ignition. Ira also knew that no fire had yet been started in the car engine. Nevertheless Ira did nothing to further investigate the problem and simply informed Mr. St. Phard that cut battery cables did not fall under the warranty.
Ira’s attempt to get the plaintiffs car .insurance company to pay for any repairs is simply the next step in a bad faith attempt to avoid responsibility under the warranty. Ira knew that no fire had occurred in the vehicle and yet attempted to deflect Mr. St. Phard’s attempts to repair the vehicle by suggesting that he call his insurance carrier (Liberty Mutual in this case).
Mr. St. Phard did so and Liberty Mutual, not surprisingly, informed him that his automobile insurance policy did not cover any repairs because there was no fire in the vehicle. The insurance company opined that a mechanical defect caused the damage. Such a mechanical defect would be covered by the warranty. The insurance company informed Mr. St. Phard of its coverage denial sometime in mid-January 1990. At this point, Mr. St. Phard again attempted to contact the salesman who sold him the vehicle at defendant Ira in order to insure that the dealership would now fix the vehicle. Mr. St. Phard hoped and expected that the work would be covered by the warranty but was willing to pay for the repair if it was not so covered. Thus, Mr. St. Phard arrived at the dealership with his wife and met with the salesman. The salesman told him that he would check with his boss in connection with the automobile. Mr. St. Phard and his wife waited patiently in the showroom for two hours while they observed the salesman handling other customers and walking about the showroom floor. Finally after two hours, Mr. St. Phard, in a soft spoken and polite manner, approached the salesman and asked him: “Did you forget me?” The salesperson expressed surprise and stated that he would go and check with his boss. Up to this time the salesperson, despite his neglect of the St. Phards for two hours, always had treated Mr. St. Phard politely.
Approximately ten to fifteen minutes later the salesperson returned with his supervisor. The identity of the supervisor is not known. The supervisor did not treat the St. Phards politely. Mr. St. Phard attempted to explain that he just wanted his car fixed. He made *126 this explanation in a quiet and calm manner. The supervisor interrupted him and told Mr. St. Phard to “get the fuck out of here." The sales manager continued to demean Mr. St. Phard and his wife and informed them that if they did not leave they would be ousted by the police and that he would call the police if they returned. At this point other people on the showroom floor were looking at the St. Phards and Mr. St. Phard’s wife was crying. The St. Phards began to leave. As they were leaving, the sales manager informed the salesperson, within earshot of the St. Phards, to “make sure this asshole leaves the property.”
Ira and its agents plainly knew that such conduct was beyond the bounds of human decency and that severe emotional distress was the likely consequence of this conduct. I completely credit Mr. St. Phard’s testimony that this outrageous and profane conduct caused him severe emotional distress that reverberates to this day.
Stunned by this behavior, Mr. St. Phard waited until the next day before trying to contact the salesperson again. Afraid to go onto the property, he telephoned. He contacted the salesperson on the telephone and repeated that he just wanted his car fixed by the dealership. The salesperson, apparently impressed with his manager’s atrocious behavior, told Mr. St. Phard, using expletives, never to call again. This intentional and appalling conduct all occured in mid-January of 1990.
By this point Mr. St. Phard’s six-month-old vehicle is no longer in his possession, he has been prohibited from going back to the dealership, the dealership has made no good faith effort to fix the vehicle despite the customer’s written authorization, and he and his wife have been verbally abused. Thereupon, Mr. St. Phard does an act which almost any consumer would do — he stops making the installment payments on the car which is now in the possession of defendant Ira.
Still hoping to get his car fixed, the defendant makes one last attempt at discussing the matter with defendant Ira on January 14, 1990. Not wanting to contact the abusive sales staff of the dealership, he talked once again to the service department. His call is forwarded to the service department manager, Mr. Ashley Cousins. Mr. St. Phard tells Mr. Cousins (as he has told any number of Ira personnel up to this point) that he just wants his car fixed and that he believes that it is under the warranty. At this point, Mr. St. Phard’s patience undoubtedly has been severely tested and his position has probably hardened. Mr. Cousins responds (once again) that the cut battery cables are the type of damage that does not fall within the warranty. I credit Mr. Cousins’s testimony that he attempted to explain to Mr. St. Phard that the dealership might pay for the cut battery cables if they found (once the battery cables were reconnected) that the malfunction was covered by the warranty. This belated explanation came a month after the incident and might have been lost on the understandably frustrated Mr. St. Phard. The plaintiff, Mr. St. Phard, announced that he would contact an attorney. In order to reconnect the battery and repair the other cut wires, a new wire harness would need to be installed in the vehicle. This part cost approximately $400.
Defendant Ira now claims that the reason that it did not do any further examination of the car and install the wire harness was because they did not have authorization from Mr. St. Phard. This excuse is, at best, far fetched. It was clear from the start that Mr. St. Phard was authorizing the dealership to fix the car. The dealership had him sign a general authorization whereby they could perform any repair on the car for any amount of money and he was promising to pay for it. To now claim that they needed further authorization to do the work is simply a bogus excuse by Ira in an attempt to deflect attention from their concerted bad faith attempt to avoid complying with the warranty contract.
Mr. St. Phard did not have any further contact with defendant Ira or its agents after January 24, 1990. Toyota Motor Credit Corporation proceeded to repossess the vehicle in February. Mr. St. Phard was forced to rent a car for three months as substitute transportation. Because of the repossession, Mr. St. Phard’s credit was harmed. He has never been able to purchase a car after this date. Instead it took approximately three months before the St. Phard family could purchase a car in his wife’s name. The damage to Mr. St. Phard’s credit history due to the repossession continued. He attempted to rent various apartments in his name but was denied leases because of the repossession. As a result, Mrs. St. Phard, his wife, has had to rent apartments in her name, purchase automobiles in her name, and obtain credit cards based on her credit history. The St. Phards again encountered the repossession on their credit history when they recently attempted to purchase a home. Fortunately, the St. Phards’ attorney intervened and explained to the lender that the repossession in question was part of an ongoing litigation matter. It is undeniable, however, that Mr. St. Phard’s credit history has been damaged by the repossession.
Furthermore, I find by a preponderance of the credible evidence that this repossession was proximately caused by the conduct undertaken in bad faith by Ira in dealing with Mr. St. Phard. Had Ira simply performed the work that was authorized and fixed the car Mr. St. Phard undoubtedly would have continued his installment payments and the car would never have been repossessed. Furthermore, had Ira not treated Mr. St. Phard so atrociously (including prohibiting him from entering the premises), some satisfactory resolution of the repair of the vehicle would have been worked out and Mr. St. Phard would have come back into possession of his vehicle.
*127 In order to succeed on his Chapter 93A claim, Mr. St. Phard does not have to prove that the problem with his vehicle was actually covered by the warranty. He has proven that defendant Ira committed a series of unfair and deceptive business practices when dealing with him in the repair of his vehicle. Nevertheless, defendant Ira has attempted (in its demand letter introduced into evidence in this case) to claim that the December 24th incident was not covered by the warranty because it was the result of a bent tailpipe. This constitutes a lame excuse which is further evidence of Ira’s bad faith. The bending of the tail pipe was, in all probability, caused by the towing of the vehicle after the overheating incident. No such damage of the tail pipe was ever noted by anyone at Ira until long after Mr. St. Phard stated that he would be contacting an attorney.
No citizen of the Commonwealth is required to submit to such unfair and deceptive business practices, undertaken in bad faith, as Mr. St. Phard endured. Mr. St. Phard simply wanted his vehicle fixed. He understood that if it was not covered by the warranty he would have to pay for the repairs. He signed a general authorization. Ira immediately attempted to avoid any responsibility under the warranty by conducting an inadequate examination of the vehicle and by informing Mr. St. Phard that cut batteiy cables did not fall within the warranty. Ira’s later intentional attempts to humiliate and intimidate Mr. St. Phard and his wife so that they would not pursue their facially legitimate warranty claims constitute not only atrocious behavior but unfair business practices intentionally undertaken in bad faith. Ira’s later attempts to claim some alleged lack of authorization (despite signed documents to the contrary) is simply a continuation of these bad faith, intentional, unfair and deceptive business practices. Chapter 93A was enacted precisely to prevent this type of unfair and overbearing conduct by businesses towards consumers.
Near the conclusion of Ernest Hemingway’s novel To Have and To Have Not, the novel’s hero, Harry Morgan, comments “a man alone ain’t got no . . . chance.” Chapter 93A now provides that chance. Its treble damage provisions for bad faith conduct must be applied on the facts of this case. Furthermore, Mr. St. Phard is entitled to attorneys fees.
I find the damages in this case to be $3,924.38 for the amount of money that the plaintiff paid on the Toyota Corolla ($2,000 down payment plus six monthly payments of $320.73). In addition, the defendant’s conduct proximately caused the plaintiff to incur three months of monthly car rentals of over $1,400 per month, totaling $1,417.50. The damage to the plaintiffs credit history is difficult to quantify. In this credit conscious age, it is, however, real damage. Conservatively calculated I would assess such damage to his credit history, all of which was proximately caused by the defendant’s conduct, to be in the vicinity of $4,000. Defendant’s conduct constituted an intentional infliction of emotional distress and I award the plaintiff damages of $8,000 to compensate for this outrageous conduct. See Haddad v. Gonzalez, 410 Mass. 855, 864-70 (1991). Thus the total actual damages are $17,341.88. These damages must be trebled due to the intentional, bad faith conduct of the defendant. Thus, the total damage amount equals $52,025.64. In addition, the plaintiff has incurred attorneys fees to date of $7,500. These in accordance with Chapter 93A, also must be paid by the defendant.

I assign little, if any, weight to Exhibit No. 8 as it is a typed work order produced long after the incident which apparently attempts to justify defendant’s conduct.