Doerfer, J.
Agreed Facts
The following facts are agreed to by the parties.
1. In 1990, John Hancock Mutual Life Insurance Company (Hancock) issued an individual disability insurance policy to Defendant Julian Banerji (“Dr. Baneiji”).
2. The policy provided a basic monthly disability benefit of $1,500, and also contained a feature called the Future Earnings Protection (“FEP”) Benefit, which allowed Dr. Baneiji to apply for additional monthly benefits as his annual income increased.
3. In November 1993, Dr. Baneiji submitted to Hancock an application to increase his monthly benefits under the FEP Benefit.
4. On December 7, 1993, Hancock approved Dr. Baneiji’s application and issued an additional benefit of $1,550 per month (plus an annual 5% cost-of-living increase).
5. In October 1994, Dr. Banerji submitted a claim for disability benefits, including a claim for both the basic benefit of $1,500 and the additional benefit of $1,550.
6. After conducting an investigation, Hancock approved Dr. Baneiji’s claim for the basic benefit of $1,500 per month, but Hancock denied Dr. Banerji’s claim for the additional monthly FEP Benefit of $ 1,550 per month.
7. Hancock denied Dr. Baneiji’s claim for the additional monthly FEP Benefit on the sole ground that Dr. Baneiji did not provide a correct answer to a question in his FEP Benefit application pertaining to the existence of “group coverage.”
8. Hancock wrote to Dr. Baneiji in March 1995 and told him that it had just discovered that Dr. Banerji had group disability insurance coverage provided by his employer in the amount of 60% of his salary, and *406 if this information had been disclosed by Dr. Banerji in his FEP Benefit application to Hancock in November 1993, he would not have qualified for the additional monthly benefit of $1,550 and it would not have been issued to him.
9. The Provident has acquired Hancock’s entire individual disability insurance line, including the base policy and the FEP Benefit issued to Dr. Banerji.
10. Hancock has not made a single $1,550 FEP Benefit payment to Dr. Banerji.
11. Hancock tendered to Dr. Banerji the premiums he had paid for the FEP Benefits, but Dr. Banerji refused the tender.
Plaintiffs’ Claims
In this action Plaintiffs ask the court to “order, adjudge and decree that the increase in monthly benefits under the FEP Benefit is void and of no effect and that Hancock is under no liability to pay these additional monthly benefits; and that ’’Banerji be ordered to surrender and deliver to Hancock for cancellation the additional monthly benefits provided under the FEP Benefit on Policy no. H9751833."
Defendant’s Counterclaims
Defendant has counterclaimed for .1) Breach of contract against Hancock and Provident Life an Accident Insurance Company (Provident); 2) Declaratory relief against Hancock and Provident that they have a duly to pay benefits; 3) Claims for breach of a duiy of good faith and fair dealing and under G.L.c. 93A, G.L.c. 176D against Hancock and Provident; 4) Intentional infliction of emotional distress; and 5) Negligent infliction of emotional distress.
Admissibility of the Application
The defendant objected to the admissibility of the application on the grounds that it was not attached to or endorsed on the policy when issued as a part thereof, relying upon G.L.c. 175, §108(5)(a). This objection was made by a motion in limine and was made continuously throughout the trial. G.L.c. 175, §108(5) (a) states in material part, “The insured shall not be bound by any statement made in an application for a policy unless a copy of such application is attached to or endorsed on the policy when issued as a part thereof.” The consequence of the failure to comply with this statute is that the insurance company may not rely on misstatements in the application as a defense to the policy. See Schiller v. Metropolitan Life Ins. Co., 295 Mass. 169, 173 (1936) (construing G.L.c. 175, §131, a similar statute with regard to life insurance).[1]
The court reserved its ruling on this fundamental issue and admitted the policy application de bene and took the defendants motion to strike under advisement. In the court’s view the predicate for the applicability of G.L.c. 175, §108(5)(a) depended on the resolution of factual and legal issues which could best be decided in the context of a full evidentiary record. In particular, the court must decide whether the application process under an FEP provision and subsequent increase in benefits invoked the protection of G.L.c. 175, §108(5)(a). In the court’s view the answer to this question requires the court to determine the character of the FEP provision in the disability policy, to evaluate the process by which increased benefits under the FEP provision were applied for and issued, and the effect of the issuance of increased coverage under the FEP benefit on the original contract of insurance.' Furthermore, there was a disputed issue of fact as to whether the application for increased coverage under the FEP benefit was delivered to the defendant when the increased benefit was issued.
In order to assess the applicability of G.L.c. 175, §108(5)(a) the court will set forth its findings regarding the application for and issuance of the initial 'policy and the submission and acceptance of the application for increased benefits under the FEP in question.
The court will also consider whether Hancock can rely on alleged misstatements in the application under general principles of insurance law, without regard to the special requirements of G.L.c. 175, §108(5)(a).
Facts
From all the evidence and reasonable inferences therefrom the court finds the following facts.
■ During the spring or summer of 1990 an agent from Hancock, Jack Turgel [Turgel], solicited Dr. Banerji (also referred to herein as the applicant) at his home in an effort to sell life and disability insurance. During that time, the applicant was employed by Harvard University which did not provide group insurance coverage. Turgel followed this first visit with numerous others during which he gave the applicant and his wife various marketing literature and information about Hancock’s policies. As a result of Turgel’s efforts, the applicant and his wife each bought disability policies from Hancock.
The 1990 application for the original disability policy purchased by the applicant, was completed at the applicant’s home in Turgel’s presence. Turgel read each question from the application to the applicant and recorded his answers on the form. Subsequently, Turgel submitted the completed application to Hancock’s Home Office for its approval.
' On August 31, 1990, after the submission of the application to Hancock, but before the application was approved, the applicant received an offer to work as a Molecular Biologist at Procept, Inc. [Procept] in Cambridge. At that time, the applicant was unaware that Procept provided group disability coverage to its employees. Two days after receiving the offer, the applicant informed Hancock of the change in employer and the resulting wage increase from $27,000 to $47,000. The applicant asked Turgel whether his disability coverage could be increased under the new change in salary. Turgel responded that although he conveyed *407 the information to Hancock, there would not be an increase in the monthly benefits on the basis of the salary increase. In addition, during September of 1990, the applicant wrote to Hancock informing it of the name and address of his new employer. Although Hancock received notice of the applicant’s new job, Hancock never inquired whether Procept provided group disability coverage.
On October 2, 1990, Hancock approved the application for individual disability insurance for a monthly benefit of $1500. In the policy, a clause called the Future Earnings Protection [FEP] gave the applicant the right to annually apply for an increase in the monthly benefit amount around the time of the policy’s anniversary. Exh. 1 at 6A. Under the FEP clause, the applicant, as he received salary increases, could increase his benefits through a term addition. The supplemental application for the term addition did not require any medical underwriting. The supplemental application did, however, call for basic information relating to the applicant’s financial status and the existence of other disability insurance.
Under the agreement, the term addition option was open to the applicant during a period of thirty days prior to each annual anniversary date of the original policy. Exh. 1 at 6A. During both October of 1991 and 1992, the applicant unsuccessfully attempted to increase his benefits under the FEP clause. Both attempts failed as a result of missing paperwork. On November 8, 1993, the applicant applied for and received, on December 3, 1993, an increase in his disability benefits under his existing disability policy with Hancock.
Around the time of the first option date, on October 13, 1991, the applicant suffered a stroke which rendered him physically unable to complete the paperwork. He was hospitalized for two months prior to returning to work at Procept in December of 1991. During this time the applicant did not file a claim under the group coverage provided by Procept and claims that at that time, he was unaware of the group disability coverage.
During July of the following year, Turgel sent the applicant a letter and a blank supplemental application informing him of his option to increase his disability benefits pursuant to the FEP clause. After receiving no response, Turgel sent a second letter and blank supplemental application on September 28, 1992. Subsequently, the applicant signed the supplemental application on October 1, 1992, and returned it to Hancock. For several months until March 1993, Irene Doherty [Doherty], a Hancock disability insurance underwriter, reviewed the supplemental application and sought confirmation of the applicant’s earnings. Ultimately, however, the application was not approved because Doherty was unable to obtain confirmation of the applicant’s earnings within the requisite time.
After these two failed attempts, Turgel, with the consent of the applicant, sent a letter to Phil Saviano [Saviano], the head of Hancock’s Individual Disability and Health Underwriting, requesting special consideration of the applicant’s future 1993 supplemental application for the term addition. The letter was written with the purpose of creating an exception for the applicant to account for the applicant’s increase in earnings during the years of 1990-1992. Usually, the term addition benefit increases are subject to one year’s wage increase and do not include prior increases received by the applicant during preceding years. Thus, instead of being limited to an increase in benefits on the current year’s salaiy increase, or the term between October 1992 and October 1993, the applicant requested that his increase in monthly benefits be based on all the yearly salary increases dating from the time the original policy was issued, or from October 1990 to October 1993. Saviano approved this exception on June 24, 1993. Doherty then advised Turgel that in order to underwrite the 1993 supplemental application, she would need the applicant’s 1991 and 1992 tax forms.
On July 23, 1993, Turgel sent another letter and supplemental application to the applicant advising him of his option to increase his disability benefits under the FEP clause. On September 1, 1993, the applicant completed and signed the supplemental application with the assistance of his wife Laura Olson. His wife completed the first page of the application, while the applicant signed and completed the second page. The application contained several answers which were crossed out for which new answers were inserted.
On October 14, 1993, Doherty received a ‘clean’ copy of the supplemental application which was not signed by the applicant. The handwriting on the first page of this application was that of his wife. On October 15, 1993, Turgel sent the ‘original’ clean application to the applicant for his signature. Doherty, however, underwrote the application on the basis of the representations contained in the unsigned application. She determined that the applicant qualified for a term addition in the amount of $1,550, which in addition to the $1,500 in benefits provided under the original policy, resulted in a total of $3,050 worth of monthly disability coverage that Hancock could issue. In arriving at this amount, Doherty relied on the insurer’s representations regarding both his salary and his lack of other disability insurance.
On November 5, 1993, Doherty sent a memo to Turgel stating the amount of additional disability coverage Hancock could offer the applicant as a term addition. In that letter, Doherty advised Turgel that she would need the applicant’s original application and acceptance of the offer by the applicant to finalize the transaction. Later that day Turgel informed Doherty the applicant approved the offer.
*408 Before the end of November 1993, Doherty received the applicant’s signed clean copy of the supplemental application dated November 8, 1993. The first page was written in Turgel’s handwriting, while the second page was signed by the applicant. The signed application had the same answers to questions seven through nine as the application underwritten by Doherty. As a result, the application was finally approved by Doherty on or about December 1, 1993. Thereafter, the premium amount was increased from $701.15 to $1,400.05.
By letter dated December 7, 1993, Hancock’s agent, Jack Turgel, informed Dr. Baneiji that his FEP application had been approved. With this letter, Mr. Turgel enclosed the FEP Benefit Endorsement (together with a blank page “3A'j and informed Dr. Banerji that it should be “attached to your disability policy.” The letter also enclosed an “Official Receipt” stating that Dr. Banerji owed $121.60. Plaintiffs have not persuaded the court by a fair preponderance of the evidence that Hancock included a copy of the FEP application when it delivered the FEP addendum to Dr. Baneiji.[2],[3]1 credit Dr. Baneiji’s testimony on this topic based upon my observations of his demeanor and manner of testifying. Other facts and circumstances also lend weight to his testimony, as follows.
Mr. Turgel’s December 7, 1993 letter to Dr. Banerji, in which he enclosed the FEP addendum, made no mention of the FEP application. Mr. Turgel did not deliver the FEP addendum to Dr. Baneiji in person, nor did Mr. Turgel review the FEP application with Dr. Baneiji when the FEP addendum was delivered. Hancock never informed Dr. Baneiji, either in writing or orally, that a copy of his FEP Application should be attached to either the original policy or to the FEP addendum. When Hancock issued the original policy in 1990, it attached Dr. Baneiji’s application to the policy, together with a special pre-printed form (the “Copy-of-Application Endorsement”) that stated, “COPY OF APPLICATION [] NOTE: Examine this copy carefully. If you find any error or omission, notify us at our Home Office immediately. Please explain fully the error or omission and give us your policy number.” When it mailed the FEP addendum to agents for delivery to policyholders, Hancock did not enclose this “Copy-of-Application Endorsement” in the packet of documents included with the FEP addendum.
Mr. Turgel has never included the “Copy-of-Application Endorsement” when mailing an FEP addendum to a policyholder, nor did he include it when mailing the FEP addenda to Dr. Baneiji, Dr. Laura Olsen, or Dr. Kevin Rafteiy, another person who received an FEP benefit.
As a matter of general practice, Hancock has never instructed its agents to enclose a copy of the FEP application when delivering an FEP addendum to their customers. This general practice of not in chiding the FEP application is part of a broader practice by Hancock of streamlining the application and underwriting process for FEP applications (as compared to the process for original policy applications) in order to save time, effort and money and in order to make it more likely that existing policyholders will exercise their FEP options. As part of this streamlined underwriting process, Hancock’s Home Office also decided that they would not require the insured to return the original policy to Hancock so that the FEP addendum could be physically attached to it, since to do so would involve additional underwriting expense as well as inconvenience to the policyholder.
I do not credit Mr. Turgel testimony that he had a personal practice of forwarding to his customers most of the documents (including the FEP application) that he received from the Home Office when an FEP addendum was issued. Turgel Test. This testimony is not corroborated by the cover letter utilized by Mr. Turgel, which refers to the FEP addendum (which, everybody concedes, was included) and to the bill for the first FEP premium (again, which everybody concedes was included), but which makes no reference to the FEP application. Mr. Turgel did not personally prepare the mailings that go to his policyholders but instead delegated that task to his secretary without providing any written instructions. He did not check the contents of the envelopes before they were mailed by his secretary. Finally, Mr. Turgel conceded that he has no idea what was actually sent to Dr. Baneiji, and that he has no basis to doubt Dr. Baneiji’s sworn testimony stating that he did not receive a copy of the FEP application when the FEP addendum was mailed to him.
Dr. Baneiji’s testimony that he did not receive a copy of the FEP application when he received the FEP addendum from Mr. Turgel is corroborated by two other clients of Mr. Turgel (Dr. Laura Olsen and Dr. Kevin Rafteiy), who testified that they too did not receive a copy of their FEP application when they received their FEP addendum in the mail from Mr. Turgel in 1992 and 1993.
. Conversely, Hancock did not produce any customer of Mr. Turgel’s who could corroborate Mr. Turgel’s testimony that he enclosed a copy of the FEP application when mailing out the FEP addendum.
In testifying that the FEP application might have been mailed to Dr. Baneiji along with the FEP Addendum, Mr. Turgel relied exclusively on (i) the fact that shortly before litigation, he found in his files a copy of the FEP application -with a handwritten date of birth for Dr. Banerji denoted on the upper right-hand corner, and (ii) his testimony that he had a general business practice of forwarding on to his policyholders a copy of the FEP application whenever he received it from the Home Office. But his reliance on such factors did not lend weight to his beliefs on this topic: (a) He could not say that he actually received an FEP application every time he received an FEP package from the Home Office. He testified that on “numerous” in *409 stances the FEP application is not included in the FEP package from the Home Office, (b) While at trial Plaintiffs introduced an exhibit that purported to be the package that Mr. Turgel received from Hancock, Mr. Turgel testified that he has absolutely no ability to verify whether this was the actual package received in December 1993 from Hancock. Mr. Turgel conceded that his file for Dr. Banerji was in a state of disarray and had been altered during the course of litigation. Thus, he was unable to form a credible belief whether a copy of the FEP application was provided to him by the Home Office at the time he received the FEP addendum for Dr. Banerji or at some other time, (c) Mr. Turgel had numerous communications with Jerry Smith, Hancock’s claim representative, and Dr. Banerji during and following the claims process. Thus, he could have received the FEP application from either Mr. Smith (who testified that he obtained a copy of the FEP application with the handwriting in the upper right-hand corner from the Underwriting File) or from Dr. Banerji (who twice received copies of the same FEP application from Mr. Smith in letters dated January 6, 1995 and March 10, 1995). Indeed, Mr. Turgel met in person with Dr. Banerji specifically to address the repudiation of the FEP benefit and could have received the FEP application at that time, (d). Even if Mr. Turgel received the FEP application from the Home Office he did not personally prepare the FEP mailings to the insureds, he had no idea what his secretary actually placed into Dr. Banerji’s (or any other insured’s) envelope, and neither he nor Hancock produced a single client who could corroborate Mr. Turgel’s explanation with testimony that they had actually received a copy of their FEP application with their FEP addendum. Thus, even if the Mr. Turgel did receive the FEP application from the Home Office, it is not a necessary inference and the court does not infer that it was then mailed to Dr. Banerji. I conclude and find that neither Turgel nor anyone else acting on behalf of Hancock included a copy of the supplemental application with that correspondence.
I. What documents form the agreement?
“[Wjhether separate documents should be read together as one integrated agreement is a question of fact which turns on the intention of the parties.” Hackel v. Federal Deposit Insurance Corporation, 858 F.Sup. 289 (D.Mass. 1994), citing Holmes Realty Trust v. Granite City Storage, 25 Mass.App.Ct. 272, 275 (1988). Writings form an integrated agreement if they form “a final expression of one or more terms of the agreement.” Coll v. PB Diaganostic Systems, Inc., 50 F.3d 1115, 1123 (1st Cir. 1995). Here there are four documents at issue: (1) the original application; (2) the original policy; (3) the supplemental application for the term addition; (4) and the term addition. The parties intent is evidenced by the terms of the contract between them. Massachusetts Municipal Wholesale Electric Co. v. Danvers, 411 Mass. 39, 57 (1991); Radio Corp. of America v. Raytheon Mfg. Co. 300 Mass. 113, 117 (1938). The language of the original policy states “[t]his policy is issued on the basis of your application and payment of the first premium ... A copy of your application is attached and is a part of this policy.” Clearly, this language supports an interpretation that the original policy and original application form one final agreement between the parties. Bouvier v. Craftsman, 300 Mass. 5, 7 (1938); Lee v. Prudential Life Insurance Co., 203 Mass. 299,300 (1909) (holding that a policy and an application together constitute the contract between the parties, and that both are to be considered in determining their rights because the application states that it should “become a part of the contract for insurance hereby applied for”). Therefore the contract, prior to Hancock’s issuing the supplemental policy, consisted of both the original policy and application. As required by the terms of the agreement, Hancock attached a copy of the application to the policy when it was issued and delivered both documents to the applicant.
Similar to the language in the original application, the supplemental application states that it “shall form the basis for any amount issued in consideration hereof and be a part of the policy specified herein.” The policy number specified in the application is that of the original policy issued by Hancock, thereby incorporating by reference the original policy. Moreover, page 6A of the original policy provides that a supplemental application for additional benefits “will become a part of this policy.” Again, it is clear from these clauses and by the supplemental application’s reference to the original policy, that the parties intended the supplemental application to become a part of the original policy of insurance. Lee v. Prudential Life Insurance, supra.
In addition, the term addition issued on the basis of the representations contained in the supplemental application, serves as an amendment to the original policy between the parties. The term addition increases the “total monthly benefits payable under benefit provision 4.1 of this policy.” Exh. 1 at 6A. Since the term addition increases the existing benefit under the original policy, it too is intended by the parties to become a part of the original policy. Reading it as a separate contract would render it meaningless. Therefore, the final contractas of October 1993, is composed of two parts: the original application and policy, and the supplemental application and term addition.
II. Whether the attachment clause in the original policy applies to the supplemental application?
Having determined the documents that form the insurance policy, the next question is whether the terms of the agreement contained in those documents require Hancock to attach a copy of the supplemental application to the term addition at the time it is issued. As previously indicated, the original policy expressly *410 states that a copy of the “application is attached and is a part of this policy.” Although the supplemental application states it is a part of the original policy, it fails to state whether it should be attached to the term addition when it is issued. Also, the supplemental application lacks language which restricts the application of the attachment clause. Thus, the issue centers on whether the attachment clause, which is in the original policy, applies to the supplemental application and term addition.
Interpretation of an insurance policy is no different from the interpretation of any other contract. Citation Insurance Company v. Brenda Gomez, 426 Mass. 379, 381 (1998), citing Hakim v. Massachusetts Insurer’s Insolvency Fund, 242 Mass. 275, 280 (1997). To give effect to the purpose of an insurance contract, it must be read as a whole. Ober v. National Casualty, 318 Mass. 27 (1945). Interpretation of a written contract is a question of law. Lexington Insurance Company v. All Regions Chemical Labs, Inc., 419 Mass. 712, 713 (1995), citing Allstate Ins. Co. v. Bearce, 412 Mass. 442, 446-47 (1992). If the terms of a contract are unambiguous, then the contract must be enforced according to its terms, in accordance with its ordinary and usual sense. Schwanbeck v. Federal-Mogul Corporation, 412 Mass. 703, 706 (1992); McCarthy v. Tobin, 44 Mass.App.Ct. 274, 111 (1998); Sage Co. v. Foley, 12 Mass.App.Ct 20, 28 (1981). If, on the other hand, ambiguity exists, then a court should consider “the entire instrument and the general scheme it reveals to determine the significance and meaning of the ambiguous terms.” Glick v. Greenleaf, 383 Mass. 290, 296 (1981). In so considering, a court may look to the circumstances under which the parties formed the agreement. Radio Corp. of America v. Raytheon MFG. Co., 300 Mass. 113, 117 (1938). If ambiguity still exists, then the language of the clause at issue is reasonably construed against the maker of the contract. Shea v. Bay State Gas Co., 383 Mass. 218, 225 (1981); Hubert v. Melrose-Wakefield Hospital Association, 40 Mass.App.Ct. 172, 177 (1996).
Generally, a finding of ambiguity does not exist merely because the parties to the contract disagree on the meaning of its terms. 5 Corbin on Contracts, §24.7 at 33-34 (Revised ed. 1998). Language in a contract is ambiguous if “an agreement’s terms are inconsistent on their face or where the phraseology can support reasonable difference[s] of opinion as to the meaning of the words employed and obligations undertaken.” Coll v. PB Diagnostic Systems, Inc., 50 F.3d 1115, 1122 (1995). A reading of the contract between Hancock and the applicant discloses the existence of an ambiguity in the attachment clause. It is unclear whether the term “application,” as used in the attachment clause of the original policy, applies to subsequent supplemental applications thereby requiring their attachment to issued term additions.
To determine the meaning of a term, or clause, it must be interpreted in light of several factors including its purpose, the contract as a whole, and the circumstances or background of its execution. Cofman v. Acton Corporation, 768 F.Sup. 392, 396 (D.Mass. 1991); John Ucello v. Bartholomew Consentino, 354 Mass. 48, 51 (1968); East Coast Aviation Corp. v. Massachusetts Port Authority, 346 Mass. 699, 704-05 (1964). Also, extrinsic evidence maybe used to discern the intended meaning of the clause. 5 Corbin on Contracts, §24.7 at 33-34 (Revised ed. 1998). Such evidence may include, but is not limited to the circumstances under which the contract was formed, and any published materials such as treatises, or dictionaries. Id. at 86.
A. The Purpose of the Attachment Clause
The purpose of attaching a copy of the application to the policy at the time is it issued is two fold. First, it protects tire applicant by affording “the opportunity to correct material errors in the application.” William F. Meyer, Life and Health Insurance Law, §6:8 at 144 (1971). Second, because the applicant has reviewed the application in conjunction with the newly issued policy, attachment secures the insurers right to rely-on misrepresentations in the application to rescind the policy. 1 The Law of Life and Health Insurance, §6.02(10] at 6-58 (Matthew Bender ed. 1999); Nacchio v. New York Life Ins. Co. 200 F.2d 770, 773 (3rd Cir. 1952). Since a policy is usually issued in consideration of the representations made in an application, those representations form “the basis for an action of rescission on the part of the company in the event of any material inaccuracy in the information contained in the application.” William F. Meyer, Life and Health Insurance Law §12:3 at 411 (1971). Thus, having the application as a part of the final policy protects both the interest of the insurer and that of the applicant.
Often, as is the case here, the application works as an offer which the insurer must accept to form an insurance contract. 1 The Law of Life and Health Insurance, §3.02 at 3-21 (Matthew Bender ed. 1999). In basing its determination as to whether to issue a policy, the insurer relies on the information in the application. Id. As this information forms part of the consideration offered by the applicant to form the insurance contract, it becomes a material part of the final agreement.
All states, under the principles discussed above, “have adopted statutes requiring the attachment of a copy of the application to the policy before the application can be used as a basis for any action of rescission.” William F. Meyer, Life and Health Insurance Law §12:3 at 412 (1971). In general, those statutes preclude the insurer’s use of the application as a basis for rescission where the application has not been made a part of the contract. Id. The reason for this restriction is that “(m]any insurers [] use the application to call limiting conditions to the [applicant’s] attention [] *411 before the policy is issued.” 1 The Law of Life and Health Insurance, §3.02 at 3-20 (Matthew Bender ed. 1999). Therefore, by requiring the attachment of the application to the issued policy, the attachment statutes reflect the importance of the application in relation to the final agreement.[4] Id. Even in light of these statutes, however, “[t]he legislatures have not answered all of the questions relating to misstatements in an application; [therefore,] the courts still play a major role in clarifying the applicable standards and deciding particular cases.” Id. §3.02(2] at 3-36.
The purpose underlying the attachment statutes enacted by various state legislatures is the same as that underlying the attachment clause in the present agreement. Accordingly, the question remains whether in light of the above objectives, the attachment clause of the original policy applies to the supplemental application. There are a few cases that touch on this issue, and apply by analogy. In one case, the Supreme Court of Pennsylvania held that the term “application,” as used in the Pennsylvania attachment statute, includes both the original application and its subsequent amendment. Sandberg v. Metropolitan Life Ins. Co., 342 Pa. 326, 231, 20 A.2d. 230 (Pa. 1941). The court reasoned that the insurer and insured agreed under the contract that the amendment should be part of the application for insurance, and that it is a necessary part of the contract for insurance. Id. Since the parties intended the amendment to form a part of the final agreement, the court held the attachment statute applied to it thereby requiring its attachment to the rest of the policy. Id.
Unlike the present case, the amendment to the application in Sandberg was made before the original policy was issued. Id. Although this case involves an amendment which became effective after the original policy was in force, the purpose used by the Pennsylvania Supreme Court in reaching its decision is equally applicable here:
[W]hat injustice might result if it were held that only that part of the application need be attached upon which defendant wishes to predicate its defense, since, for example, an unattached part might easily explain apparently fraudulent statements made in the attached part.
Id. As in Sandberg, both parties to the present action have relied on the terms contained in both the original policy and its subsequent amendments. Therefore, failure to attach material portions of the contract, such as the supplemental amendment, defeats the objective of the attachment requirement.
Similarly, a United States District Court held that the term “application includes in its meaning a preliminary application because it was ’’executed for the purpose of acquiring insurance coverage, in which representations are made about a party’s insurability." Commercial Life Insurance Co. v. Lone Star Life Insurance Company, 727 F.Sup. 467, 472 (N.D.Ill. 1989). The court in Lone Star looked to the purpose of the document over its form and determined that its use is “to provide!] information through which Lone Star could evaluate the risk of coverage.” Id. at 471. Accordingly, the court held that attachment of the document, no matter what it was called, was required.
In essence, attachment is required when “the supplemental application [ ] contains [ ] new matter of material import.” Couch on Insurance §18:8 at 18-12 (3d ed. 1999). Thus, any document or application which makes a substantial amendment to the original policy must be attached to the policy. Id. Applying the same principles to the case at bar, and keeping in mind the purpose of the attachment clause in the contract between Hancock and the applicant, it is clear that to effectuate its objective, a copy of the supplemental application should be attached to the issued term addition. Here, the supplemental application contains information of material import" because it states that the representations made in it form the basis of the amount of additional benefits issued by Hancock. Also, it states that it is a part of the original policy. Moreover, in a letter dated May 10, 1993, sent by Hancock to the insured, Hancock acknowledges that the information contained in the supplemental application “is important because our underwriting department relies on this to determine whether an increase in coverage can be issued.” Exh. 89.
There is no doubt that Hancock considers the supplemental application to be a part of the insurance contract. In addition, the representations in the supplemental application supply information which Hancock used to determine whether the applicant was entitled to an increase in benefits. Thus, both the application and supplemental application equally formed the consideration upon which Hancock issued the final policy. Since the representations in the supplemental application are a material part of the contract, the attachment clause applies to the supplemental application. Again, failure to attach a copy of the supplemental application to the term addition,[5] defeats the objective of the attachment clause.
B. Reading the Contract as a Whole
In reading a contract as a whole, its construction should be “in such a way that no word or phrase is made meaningless by interpreting another word or phrase[.]’’ The Lexington Insurance Company v. All Regions Chemical Labs, Inc., 419 Mass. 712, 713 (1995), citing Shayeb v. Holland, 321 Mass. 429, 432 (1947). In doing so, reasonable effect must be given to each of the contract’s provisions with the object of effecting “a rational business instrument.” McMahon v. Monarch Life Ins. Co., 345 Mass. 261, 264 (1962). Special emphasis to any one part of the contract should not be given, as each phrase must be reasonably interpreted in light of the entire agreement. Ucello v. Consentino, 354 Mass. 48, 51 (1968). Simply put, *412 contractual language “is not self-interpreting,” but requires understanding under the “general purpose manifested by the entire contract!.]” Cofman v. Acton Corp. 768 F.Sup. 396 (D.Mass. 1991). Therefore, examination of the purpose of other clauses written in the policy may aid in interpreting the scope of the attachment clause.
The first of two clauses which help in the interpretation of the attachment clause is the “free look” clause. The free look clause in the original policy between Hancock and the applicant is titled “Your Right To Return Policy Within Ten Days.” It states:
[i]f you are not satisfied with this policy, return it within ten days of receipt. Mail or deliver it to our agent or to our Home Office. We will then refund any premiums you have paid. This policy will then be considered never to have been issued.
Exh. 1. Generally, the making of an insurance contract does not require either delivery of the policy or the applicant’s actual possession thereof unless the contract expressly requires its delivery to the applicant. Krause v. Equitable Life Insurance, 333 Mass. 200, 203-04 (1955). Clearly, the insurance contract at issue does not require delivery of the policy for its formation as it expressly states that the “policy is issued on the basis of [the] application and payment of the First Premium [] on or before delivery of this policy.” Exh. 1. (Emphasis Supplied). Thus, the contract between Hancock and the applicant was in existence prior to its delivery.
Essentially, the “free look” clause provides the applicant with a period of time during which the applicant may revoke the agreement and suffer no damages. In order to do so, however, the entire contractthe issued policy and applicationmust be before the applicant for its examination. As previously determined, the pre-amended policy consists of both the original application and the policy issued by Hancock. Therefore, as the applicant has the contractual right to examine the policy for ten days, there is the implicit requirement that the applicant have a copy of the entire agreement before him.
At common law, “the [applicant] has a general duty to inspect the insurance policy after it has been delivered.” 1 The Law of Life and Health Insurance, §6.02[10] at 6-58 (Matthew Bender ed. 1999). In order to inspect the policy, the applicant has to have a copy of it. By writing the ‘free look’ clause into the policy, Hancock acknowledges the importance of the applicant’s review of the terms of the contract in order to correct any mistakes or misunderstandings. As such, Hancock’s intent is to prevent situations where • it cannot rely on the terms of the agreement. See Ives v. INA Life Ins. Co., 790 P.2d 1206 (Or.Ct.App. 1990) (ruling that since a copy of the application was attached, the insurer could rely on it).
In light of the purpose of the ‘free look’ clause, it makes sense to require the attachment of the application to the policy when it is issued, because the ‘policy is issued on the basis of [the representations made in the] application." Exh. 1. (Emphasis supplied.) So any subsequent claims under the policy brought by the applicant against the insurer, or vice versa, would involve both the terms of the application and the terms of the policy itself. Thus, it follows that a supplemental application which forms the basis of the term addition and which is a part of the policy should be attached to the term addition.
The second clause that is relevant to the present issue states that “the policy is issued on the basis of [the] application and payment of the first premium.” In general, “the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and consideration.” Restatement of Contracts 2d, §17. To form consideration “it is enough that one party manifests an intention to induce the other’s response and to be induced by it and that the other responds in accordance with the inducement.” Restatement of Contracts 2d, §71. In the present case, the contract itself states that the application, in addition to the payment of the first premium, serves as the consideration for the issued policy.
As the representations in the application serve as part of the consideration exchanged, the policy and the application for it must be construed together to determine the rights of the parties. Adamitis v. Metropolitan Life Insurance Company, 295 Mass. 215, 219 (1936) (holding that language in the policy that states the application “forms the basis” of the policy, and where an application makes reference to a supplementary contract, all three documents are to be construed together to determine the rights of the parties). Should the insurer, upon a claim brought under the policy want to deny coverage, it will have to rely on both the terms of the application together with the issued policy.
In light of both the “free look” and the “forms the basis” clauses, the general intent of making the application a part of the agreement emerges is to provide both parties with all the terms on which they rely. With the intent of protecting itself in the event of a future claim, Hancock expressly establishes the application as a part of the contract. By its terms, it imposes on the applicant the contractual duty of understanding the terms of the policy and correcting any language which may be incorrect.
Under this general purpose, and by the express language of the contract, it is difficult, if not impossible to limit the policy’s attachment clause to the original application. There are three reasons for this conclusion. First, the supplemental application states that it is a part of the policy. “[E]very phrase and clause must be presumed to have been designedly employed, and must be given meaning and effect, whenever practicable, when construed with all the other phraseology contained in the instrument, which must be consid *413 ered as a workable and harmonious means for carrying out and effectuating the intent of the parties.” J.A. Sullivan v. Commonwealth, 397 Mass. 789, 795 (1986). In an effort to harmonize the meaning of the attachment clause with the rest of the insurance contract, it is difficult to reconcile Hancock’s position of treating the original and supplementary applications differently. First, Hancock claims the “original application,” which forms the basis of the policy, and which expressly is made a part of the policy, should be attached as a part of the policy when it is issued. While on the other hand, Hancock claims the “supplemental application,” which also forms the basis of the term addition and becomes a part of the policy, should not be attached as a part of the term addition at the time it is issued. Such an interpretation cannot be supported under the terms of this agreement. Had Hancock wanted a different treatment for the supplemental application, it could have expressly stated so, in either the original policy or subsequent application. Although the supplemental application does not expressly state that it should be attached to the term addition, it is Hancock’s failure to negate or limit the scope of the attachment clause in the original policy which causes the attachment clause to apply to subsequent applications. Construction of the attachment clause as inapplicable to subsequent applications, would render the clause meaningless. The Lexington Insurance Company v. All Regions Chemical Labs, Inc., 419 Mass. 712, 713 (1995), citing Shayeb v. Holland, 321 Mass. 429, 432 (1947).
The second reason is that applying the attachment clause to the supplemental application follows the general purpose of the agreement. A different interpretation might result had the application been for the renewal or reinstatement of a lapsed policy. This is because that type of application does not contain material information since none of the answers serve as the basis for insurance issued by Hancock. Couch on Insurance §18:10 at 18-13 (3d ed. 1995). What is difficult to ignore is that the supplemental application contains representations which form the basis of additional insurance coverage. In other words, the supplemental application provided information which served as the ground on which Hancock issued the term addition or amendment expanding the total disability coverage under the original policy. Therefore, the terms of the original policy were materially changed by the insurer’s acceptance of the supplemental application. Thus in keeping with the object of the attachment clause, it makes sense to require its attachment to the term addition. Couch on Insurance §18:8 at 18-12 (3d ed. 1995).
The third and final reason stems from the rule of construction that states the interpretation of a word or phrase of a contract should not render “another word or phrase meaningless.” McMahon v. Monarch Life Ins. Co., 345 Mass. 264 (1962). In the present instance, making a distinction between two applications, the original and the supplemental, both of which serve as the basis for the agreement and expressly are made a part of the policy, would render the attachment clause meaningless. There is no language that restricts the scope of the attachment clause from applying to supplemental applications. Since no distinction is expressly made in the policy, no distinction should be made by this court.
C. The Circumstances of the Contract’s Execution
Hancock’s general practice is to treat the supplemental application for a term addition differently from the original application for insurance. First, the supplemental application does not contain any medical or health related questions. Instead, its focus is on the applicant’s financial and insurance coverage status. Second, because Hancock’s object is to streamline the application and underwriting process for its term additions to save time, effort and money, it is not in the practice of attaching a copy of the supplemental application to the term addition. Also, Hancock’s goal is to keep the process simple so as to make it more likely that existing policyholders will exercise their FEP options.
Unlike the original application, Turgel was not present to explain the terms of the supplementary application to the applicant. Even though Turgel was aware the applicant had suffered a stroke in 1991, and was disabled as a result, Turgel failed to assist the applicant with any of the questions contained in the supplemental application. Instead, the transaction was completed through the mail such that the extent of the interaction between the parties involved Turgel recopying the applicant’s answers onto a ‘clean’ supplemental application which was then sent back to the applicant for his signature. Turgel was not a witness to the completion of the application.
Considering the underlying circumstances under which the term addition was issued to the applicant, it is unreasonable for Hancock to rely on the statements contained in the supplemental application. With all the applications that were sent back and forth between the parties, it would have made sense for Hancock to at least attach a copy of it to the term addition. Instead, Turgel sent only the term addition, and advised the applicant to attach that document to the policy. This action coupled with the contractual language in the supplemental application that states it is a part of the original policy, discloses Turgel’s failed attempt at complying with that contractual provision. In order to satisfy that clause, Turgel should have attached a copy of the application to the term addition and then advised the applicant to attach those two documents to the original policy. Thus, although Hancock is willing to take risks in its underwriting practices of the term additions in an effort to save money, and to rely, without explanation to the *414 applicant, on ambiguous clauses in its policy, it is unwilling to accept the responsibility of problems which arise as a result of these actions.
In general, ambiguities are interpreted against the insurer, or drafter of the policy. The purpose of this rule of interpretation rests on the fact that “[a]n insurance policy is a ’’contract of adhesion." William F. Meyer, Life and Health Insurance Law, A Summary §4:2 at 63 (1976). In other words, “the terms of the policy are selected by the company and offered without change to the policyholder who must either accept them as written or reject them. Because the [applicant] plays no part in drawing up the contract, there is a well recognized rule of construction that if the policy terms are ambiguous they will be construed against the company and in favor of the applicant. Id. Here, the ambiguity that exists under the attachment clause in the contract is reasonably interpreted against Hancock. Hancock knew or should have anticipated that the clause elicits more than one reasonable interpretation. The terms of Hancock’s policy gives the applicant the right to fill out supplemental applications for term additions knowing that these documents would be incorporated by reference into the original policy, however in so doing, fails to account in the contract for the treatment of those applications. As such, the term ’’application" as used in the attachment clause in the original policy, applies to supplemental policies which form the basis of any issued term addition. Accordingly, Hancock was under a contractual duty to attach a copy of the supplementary application to the term addition. Having failed to do so precludes Hancock from relying on the terms in supplementary application in bringing this rescission action.
The only grounds upon which Hancock relies for rescission is the incorrect statement of Dr. Baneiji in the application that he had no other disability insurance. Hence Hancock is not entitled to rescission and judgment must be entered for the defendant on plaintiffs complaint.
Defendant’s Counterclaims
Defendant has counterclaimed for 1) Breach of contract against Hancock and Provident Life and Accident Insurance Company (Provident); 2) Declaratory relief against Hancock and Provident that they have a duty to pay benefits; 3) Claims for breach of a duty of good faith and fair dealing and under G.L.c. 93A, G.L.c. 176D against Hancock and Provident; 4) Intentional infliction of emotional distress; and 5) Negligent infliction of emotional distress.
From the foregoing findings and rulings the court also finds and rules that Hancock has breached its contract with Dr. Banerji by failing to pay to him the increased benefits which he is entitled to under the contract. A declaratory judgment shall issue so stating and directing that Hancock pay as damages all moneys due which have been withheld, with interest from the date they were withheld. An order shall also issue directing that Hancock resume the monthly payments which the court has now determined are due on a monthly basis.
I reject the theory of damages proposed by Banerji that when an insurer wrongfully repudiates a disability policy, the policyholder is entitled to recover the present value of all future benefits that might possibly become due under the policy. Baneiji does not cite any Massachusetts case in support of this theory, and I therefore conclude that this theory has never been followed in Massachusetts. None of the out-of-state cases cited by Banerji are applicable here because Hancock did not engage in any form of wrongful or bad faith conduct in seeking judicial rescission of the FEP benefit, which is an underlying finding in the cases cited. Furthermore, the dissent in the Aetna v. Phifer case, a 1923 case from Arkansas, points out that the court’s holding is directly contrary to the majority rule on this issue. The dissent cites a Massachusetts case, Badger v. Titcomb, 15 Pick. (Mass.) 409 (1834), as contrary authority which supports the majority rule and rejects the rule announced by the Arkansas court in the Phifer case. The Badger case supports the principle that future installments under a contract cannot be accelerated and included as court-ordered' damages if they were not due at the time damages were awarded. The one Massachusetts case cited by Baneiji, Commissioner of Insurance vs. Massachusetts Accident Co., 314 Mass. 558 (1943), involved an insurance company’s insolvency and therefore has no precedential value to the present case.
I also reject Banerji’s contention that he is entitled to recover his reasonable attorneys fees and costs incurred in defending Hancock’s rescission claim. Banerji cites the case of Preferred Mutual Ins. Co. v. Gamache, 426 Mass. 93 (1997), in support of this contention. In Gamache, the Supreme Judicial Court carved out “an exception to [Massachusetts’] traditional rule disallowing attorneys fees and expenses” and allowed an insured to recover attorneys fees and expenses incurred in successfully establishing the insurer’s duty to defend under a homeowner’s policy. The Court established this exception because of the “special relationship” between an insurer and an insured under a homeowner’s or similar type of policy where the insurer has a contractual “duty to defend” the insured. Id. at 96-97. This exception was recently expanded to include a comprehensive liability policy and the insured established in a declaratory judgment action that the insurer had violated its duty to defend. Rubenstein v. Royal Insurance Co. of America, 429 Mass. 355 (1999). However, this case does not involve a liability insurer’s duty to defend ancillary litigation. Given that this is an exception to the traditional rule that each party bears its own attorneys fees and costs, it should not be expanded beyond the limited factual situation as set forth in Gamache and Rubenstein.
*415 Claims of Unfair Settlement Practices
Baneiji filed his disability claim with Hancock on October 26, 1994. In his claim form, he stated that his “sickness” began on August 19, 1994. In response to the question “when do you expect you’ll be able to return to work?,” Baneiji responded “never.” In response to the further question “will not settlement in full on that basis be satisfactory to you?,” Banerji answered “not applicable.”
Baneiji’s disability claim was assigned to Jeny Smith in November 1994. Smith began his review of the claim by seeking to obtain Baneiji’s medical records for any recent medical treatment, as well as his treatment in 1991. This was done in order to determine whether Baneiji was disabled under the terms of the Hancock policy. Smith also sought to obtain information from Procept concerning Baneiji’s employment, his earnings and the existence of any group disability coverage. Smith had previously obtained the Hancock underwriting file relating to Baneiji’s policy and learned that the FEP benefit increase was still within the two-year contestable period. Therefore, in accordance with the usual and customaiy manner in which he processed claims, Smith sought to determine whether Baneiji’s statements on his FEP application were truthful.
On December 1, 1994, Smith spoke with Jean Fletcher at Procept concerning Baneiji’s employment and benefits at Procept. On December 20, 1994, Jean Fletcher provided Smith with a written statement concerning the fact that Baneiji had group disability insurance coverage with UNUM Insurance Company in an amount equal to 60 percent of his base salary and that this coverage had become effective on January 1, 1993.
In addition, Smith sent a letter to Jack Turgel dated December 20, 1994 and asked Turgel for information concerning the circumstances surrounding Turgel’s solicitation of the FEP benefit application.
Turgel responded to Smith by letter dated December 22, 1994 and provided answers to Smith’s questions concerning the FEP application. In response to Smith’s question on whether Turgel had any knowledge in 1992 or 1993 concerning any group disability LTD coverage not recorded on the November 10, 1993 application, Turgel responded “I had no personal knowledge that he [Baneiji] had group LTD.”
Smith sent a letter to Baneiji on Januaiy 6, 1995 to advise him of the status of his claim. Smith noted that Baneiji had not returned documentation and requested information that had been sent to him on November 8 and again on November 22 and December 14, 1994. Enclosed with this letter was a copy of Baneiji’s FEP application in which he stated that he had no other disability income coverage in force. Smith advised Baneiji that he had recently received information documenting group LTD coverage effective January 1, 1992.
Smith sent another letter to Banerji on January 9, 1995 after discussing the claim with Baneiji by telephone on the same date. Smith again asked Banerji to submit tax returns and monthly pay stubs, as he had requested in previous correspondence. Enclosed with this letter was a check payable to Banerji for disability benefits for the period November 17 through December 17, 1994 in the amount of $1,500.
Baneiji provided the requested financial information with his letter dated Januaiy 16, 1995, and Smith notified Banerji that this information would be sent to the Hancock underwriting department for further review.
On February 6, 1995, Smith sent a memorandum to Hancock’s IDH Policy Services Department to the attention of Ellen McDonough. The memo was referred to Irene Doheriy. The memo advised of the information obtained during the claims investigation concerning Baneiji’s earnings and the existence of group LTD coverage and asked the question “If you had been aware of the above listed information at time of underwriting, would the increase in coverage had been approved?”
Irene Doherty, Hancock’s Senior Underwriting Consultant, responded to Smith’s memo by means of a handwritten memo dated February 17, 1995. Her response was that the minor discrepancy in Banerji’s earnings as stated in his FEP application was not significant, but the failure to disclose the existence of the employer-provided group disability coverage meant that the FEP benefit increase would not have been available for issuance in 1993.
In reaching her conclusion that the FEP benefit increase would not have been issued in 1993 if Hancock had known of the existence of the group LTD coverage, Doherty again prepared a “Two Year Term Worksheet,” just as she had done in November 1993 when she underwrote Banerji’s FEP application. She again assumed Baneiji’s earnings were $55,845, which would qualify him for a maximum issue and participation amount of $3,050 (Exhibit 11). She further assumed that the group LTD coverage would provide a monthly benefit of $5,340, which in itself would result in an over insurance situation according to Hancock’s issue and participation limits. In her testimony, Doheriy acknowledged that the group LTD benefit was not $5,340, but was approximately $2,792 (60 percent of $4,654), but this did not alter her conclusion that Baneiji was already over insured due to the existence of the group LTD coverage.
Irene Doheriy testified as to the reasons why the undisclosed group disability coverage was material to Hancock’s decision to increase Banerji’s benefits under the FEP benefit. Quite simply, Baneiji’s failure to disclose this information meant that Banerji was *416 over insured for disability benefits based upon the amount of his earnings. Banerji’s actual earnings in 1993 were $55,238.53 (Exhibit 84-page 3), or $4,603.21 per month. The group disability coverage provided by Procept through the UNUM group policy amounted to 60 percent of these earnings, or the amount of $2,761.93 per month. When the basic Hancock disability benefit of $1,500 is added to this amount, Banerji’s monthly disability benefit equaled $4,261.93, which was well in excess of Hancock’s published issue and participation limit of $3,050. This amount also equaled more than 92 percent of Banerji’s ■ earnings. When the FEP benefit of $1,550 is added to this amount, the total benefit equals $5,811.93, an amount well in excess of Baneiji’s monthly earnings of $4,603.21.
Both Irene Doherty and Jerry Smith testified and believed in good faith that over insurance with respect to disability insurance is a serious problem because of the risk of malingering and a disinclination on the part of the insured to return to work. If an over insured individual can receive more money by staying home on disability than he/she can receive by going to work, there is an obvious risk of a more extensive claim over a longer period of time. This results in a poorer claims experience for Hancock and greater cost to Hancock’s other policyholders. For these reasons, Hancock limits the amount of risk in which it will participate on any one individual in accordance with its issue and participation limits.
Baneiji offered the testimony of Arthur Andersen, an actuary, to rebut the testimony of Irene Doherty concerning the importance and materiality of the undisclosed group disability coverage to the underwriting of the FEP benefit. I do not consider his testimony to be persuasive on the underwriting issues in this case. Hancock’s disability premium rates are established based upon the applicant’s age and occupation and are set forth in Hancock’s Rate Book for individual disability insurance (Exhibit 2). Mr. Anderson testified that these premium rates are based upon actuarial calculations which in turn are based upon Hancock’s overall experience for persons similarly situated by age and occupation. But actuarially determined premium rates are only half of the stoiy when it comes to determining whether Hancock will issue a policy or not, and if so, at what premium rate for a specific individual. Anderson conceded that an applicant with a serious medical condition would be a greater risk to insure for disability coverage than someone who has no medical impairment, and an insurer would want to guard against this greater risk by either charging a higher premium rate to this individual or by simply not issuing any policy at all. The same conclusion logically follows with respect to an applicant who is over insured for disability insurance. Hancock’s underwriters, as Irene Doherty did in this case, could choose to simply not provide any further disability insurance coverage to someone like Dr. Baneiji who is already over insured.
Banerji also presented testimony from Donald Ketzler with respect to Hancock’s underwriting practices in connection with the FEP benefit. He testified that there was a so-called “young person’s exception” applicable to the FEP application. The specific example given was medical students or interns who were expected to have a significant and dramatic increase in earnings in the near future and this would justify providing more coverage than specified in Hancock’s issue and participation table. Whether this exception actually was applied in practice or not is unnecessary to decide because Dr. Banerji did not come within the description of the “young person’s exception.” Dr. Baneiji was not a medical doctor and his earnings were not expected to dramatically increase on and after 1993. While he had received modest pay increases in 1992 and 1993 (Exhibits 33, 60), there was no indication that a substantial pay increase was imminent which would justify an exception to Hancock’s issue and participation limits. In fact, the rate of Baneiji’s pay increases was declining from 8.5 percent in 1992 (Exhibit 33) to 5.96 percent in 1993 (Exhibit 60). There was no justifiable basis for providing an exception in the issue and participation limits with respect to Baneiji’s FEP application.
Mr. Ketzler’s testimony was also contradicted by the testimony of Dr. Kevin Rafteiy. Dr. Raftery was issued a Hancock disability policy which contained an FEP benefit and in February 1994 he applied for an increase in his benefits. However, Dr. Rafteiy had recently switched jobs and was now provided with group disability coverage by his employer, the Lahey Clinic. Thus, his FEP application was rejected because his “present coverage is presently at maximum allowable limits.” (Exhibit 130.)
The court is persuaded that the only exception Hancock made related to young medical doctors who were serving their internships and were expected to have a very significant increase in earnings when they became affiliated with a hospital in their medical practice. This was the case with one Dr. Albert who was expected to receive a substantial increase in earnings when she was no longer an intern at Cornell University medical college. This exception would not be applicable to Dr. Banerji, who was not a medical doctor.
Jerry Smith accepted Irene Doherty’s underwriting opinion that the FEP benefit increase would not have been issued if Hancock had known of Baneiji’s group LTD coverage. He undertook to rescind this coverage and refund the premiums that Baneiji had previously paid for this coverage.
On March 10, 1995, Smith sent a letter to Banerji and advised him on the underwriting determination that the FEP benefit increase would not have been issued if the group LTD coverage had been disclosed *417 in response to question 8 in Baneiji’s application. He explained that Hancock considered this increase to be null and void and he enclosed a check representing a refund of all premiums paid for this coverage. Smith concluded his letter by stating: “If you feel we have misunderstood any of the information concerning these matters, please submit an explanation, and we will be glad to review it for you. If you should have any other questions, please do not hesitate to contact us.”
Baneiji did not respond to Smith’s March 10 letter until April 10, 1995. Banerji did not provide any explanation concerning his failure to disclose the group LTD coverage. He concluded his letter by stating “I do not want to resolve the FEP issue (raised in your letter of March 10th) on the terms you propose.”
On April 20, 1995, Baneiji telephoned Smith. They spoke about Banerji’s unwillingness to accept Hancock’s decision to rescind the FEP benefit. Smith mentioned to Baneiji the possibility of dispute resolution at this time, but Baneiji said he was not interested. Baneiji said he was currently in the process of obtaining counsel to represent him and he would have his attorney send Hancock a letter of representation as soon as he could.
On or about April 24, 1995, Smith received a form letter from Bruce A. Peters of the Massachusetts Division of Insurance together with a “Consumer Complaint Form” signed by Baneiji. Smith responded to this letter on May 2, 1995 when he sent a letter to Mr. Peters at the Division of Insurance. In his letter, Smith explained the reason why the FEP benefit increase was being rescinded. He enclosed with his letter a copy of the correspondence sent to Baneiji which explained the reasons for the rescission of the increase in coverage. Smith did not receive any further communication from the Division of Insurance.
In April and again in May 1995, Smith spoke with Hartley Echerd, an attorney in Provident’s Law Department, concerning the rescission of Baneiji’s FEP benefit. Following their conversation in May 1995, Smith no longer had responsibility for handling Baneiji’s FEP benefit claim. The present action seeking rescission of the FEP benefit was commenced in Suffolk Superior Court in June 1995.
With respect to Baneiji’s basic claim for disability benefits under the Hancock policy, the monthly benefit of $1,500 has been paid to Baneiji eveiy month from Januaiy 1995 to the present. Jerry Smith testified that an audit of benefit payments to Baneiji had been prepared and covered the period from January 1995 through September 1999 (Exhibit 141). This audit shows, and Smith so testified, that benefit payments were made to Baneiji on a timely basis throughout the years 1995 through 1997, the first six months of 1998 and throughout 1999. The audit also shows that during the last six months of 1998 several benefit payments were delayed and not paid until January 1999 (Exhibit 141-p. 3, “Processed Date" column). Smith testified that these benefit payments were delayed due to the fact that Baneiji had not provided requested information relating to his earnings from work at Genetics Institute. Once this information was received, and Provident confirmed that Baneiji was not receiving earnings in excess of 25 percent of his pre-disability earnings, Provident processed and remitted Baneiji’s monthly benefit checks.
Provident requested financial information from Baneiji because Banerji began working at Genetics Institute in Andover, Massachusetts in February 1997. He worked as a visiting scientist for about 8 to 10 hours a week and was paid $1,000 per month.
Under the terms of Banerji’s Hancock policy, Baneiji could still receive his monthly disability benefit, even though he had returned to work and was being paid, provided that his earnings did not exceed 25 percent of his pre-disability earnings. This is in accordance with paragraph 4.1 of the policy, entitled “Disability Benefit.” This “residual disability” aspect of Baneiji’s claim was the reason why Provident requested financial information from Banerji.
In November 1997, after learning that Banerji was working at Genetics Institute, Provident conducted a three-day surveillance of Banerji to determine his physical activities. The surveillance report of InPhoto Surveillance Company dated November 26, 1997 was introduced into evidence by Baneiji (Exhibit 143). The report shows that Banerji was active and engaged in activities outside of his home during the three days of surveillance. Baneiji was observed departing his residence and traveling to the Lincoln Public Library, to the Genetics Institute building in Cambridge, and later to the Genetics Institute office in Andover. Baneiji was also observed traveling to Boston College High School in Boston and also to The Boston Globe building. He was also observed going to and from the Hartwell School/Magic Garden preschool. All of this surveillance was conducted while Baneiji was on public ways are in areas open to the public. Baneiji was observed engaging in physical activities including walking, standing, carrying objects, entering and exiting of a car and driving. The surveillance also noted that Baneiji walked with a limp, but did not utilize a cane while moving about. Following receipt of this report, Provident continued to pay Baneiji his basic monthly benefit.
In March 1998, Deborah Redman, the Provident claims representative handling Banerji’s continuing disability claim, requested Michelle Jackson, a Licensed Certified Social Worker, to conduct a neurological/psychological evaluation of Baneiji’s claim file. Ms. Redman presented three questions to Ms. Jackson:
1. Is Baneiji under appropriate care?
2. Is there any objective evidence to support any restrictions and limitations?
*418 3. Is any additional testing (neuro-psych) needed to document claimant’s restrictions and limitations?
In response to question no. 1, Ms. Jackson stated that “it is unclear what the claimant’s primary disabling condition is and therefore difficult to ascertain what appropriate care would be.” She went on to note that “I do not see any evidence of treatment or involvement from a psychiatrist for the purported cognitive or behavioral abnormalities, temper control or cognitive planning.”
In response to question no. 2, Ms. Jackson stated “No,” there do not appear to be any objective evidence to support any restrictions and limitations.
In response to question no. 3, Ms. Jackson noted that Banerji underwent extensive neuropsychological testing in 1991 which revealed continued normal to superior cognitive functioning post-stroke. She went on to suggest that “A repeat neuropsych test battery could evaluate the claimant’s current functioning, compared to previous functioning and could identify any areas of impairment in cognitive functioning as well has evaluate the behavioral/psychiatric components, if present.”
Based on the foregoing neuropsychological evaluation by Michelle Jackson, as well as the surveillance report of Baneiji’s activities and the information provided by Baneiji and his attending physician Dr. Caplan, Deborah Redman, on May 29, 1998, notified Baneiji that “In order for our office to have a better understanding of your claim, the Company wishes to exercise its right to have you examined by an independent medical examiner.” This examination was scheduled for July 13, 1998 at the Massachusetts General hospital before Thomas Deters, Ph.D. The letter advised Baneiji to call Deborah Redman immediately if he was not able to keep this appointment.
The “right to examine” that Deborah Redman referenced in her letter is set forth in Baneiji’s policy at page 8, paragraph 6.7 entitled “Physical Examination," which provides that “We will have the right and opportunity to have you examined, when and as often as we may reasonably require, while a claim is pending.”
The independent medical examination of Baneiji scheduled for July 13, 1998 was the first time that Hancock/Provident had requested an examination of Baneiji.
The scheduled independent examination of Banerji never took place because Dr. Deters became ill and canceled the examination prior to the time of the examination. Thereafter, Baneiji’s attorney, Robert Gilbert, raised some objections to the conduct of the examination. Hancock’s attorney Edward Rooney responded to attorney Gilbert by letter dated July 13, 1998 and provided answers to the questions posed by attorney Gilbert. Attorney Gilbert made no further response to attorney Rooney concerning the IME.
At the time that Deborah Redman scheduled the IME of Baneiji on May 29, 1998, no one in the Provident claims department had any knowledge that Baneiji’s attorney had recently filed a motion for summary judgment in this case in Suffolk Superior Court. The scheduling of the IME was not in any way prompted by, or motivated by, the fact that Banerji’s attorney had filed a motion for summary judgment.
Based on all of the evidence, I find that Provident has handled Baneiji’s claim in a fair and reasonable manner and has not engaged in any form of unfair claims settlement practices. Provident had a reasonable basis to request financial information from Baneiji, to conduct a surveillance of Baneiji and to schedule an IME of Baneiji. These were reasonable steps to pursue in light of the information that Provident had concerning Baneiji’s claim of disability, his condition and his activities, all as documented in the claim file.
Barierji’s Claim of Presumptive Disability
Baneiji testified with respect to be limited use he has of his left hand and left foot. This was presented as Baneiji’s proof that these limitations qualify his disability as a “Presumptive Disability” under paragraph 5.1 of the Hancock policy. This provision states in material part that “You will be presumed to be disabled if injury or sickness causes total and permanent loss of any of the. following: Your use of one hand and one foot.”
Baneiji did not provide any independent medical testimony on the loss of the use of his left hand and left foot, although his wife Dr. Laura Olson confirmed Baneiji’s testimony.
Baneiji does not satisfy the definition of a presumptive disability because he has the use of both his left foot and right foot. Although the use of his left hand may be limited or non-existent, he does have the use of both his feet as he is fully able to walk and carry on physical activities without the use of a cane, crutch, walker or other artificial device. He does not have total and permanent loss in the use of “one hand and one foot.”
The Acquisition of Hancock’s Disability Business by Provident
In July 1992, Hancock and Provident entered into an “Acquisition Agreement” (Exhibit 29) with respect to Hancock’s individual disability business. At the same time Hancock and Provident entered into the following related agreements:
-Reinsurance Agreement (two forms) (Exhibits 30, 31)
-Administrative Services Agreement (Exhibit 142)
Under these agreements Provident agreed to rein-sure 100 percent of the Hancock disability line of business and to pay those claims on Hancock’s policies that accrue on and after the date of the acquisition (Exhibit 29-Section 2.04, Exhibit 30-Article 1). Hancock granted to Provident full authority in all matters relating to policy administration and appointed Provident as the attorney-in-fact for Hancock with respect to the rights, duties, privileges and obligations of Hancock under Hancock’s policies, with full power and authority to act in the name, place and stead of *419 Hancock. This power and authority included without limitation the power to service all policies, to defend, settle and pay all claims and to take such other actions as may be necessary or desirable to effect the transactions contemplated by the Acquisition Agreement (Exhibit 30-p. A-4, Article VI).
Before Hancock and Provident could conclude the Acquisition Agreement, both parties had to obtain all necessary governmental and regulatory consents and approvals (Exhibit 29-p. 36, Section 7.03 and p. 39, Section 8.03 and Exhibit 31-Reinsurance Agreement, paragraph 4). These consents and approvals had to be obtained from the regulatory authorities in the states of Massachusetts, New York and Tennessee (Exhibit 29-Schedules 3.09 and 4.04).
Banerji has raised the argument that Provident’s acquisition of Hancock’s disability business was harmful to him because Provident is more aggressive in its handling of disability claims. Based on all of the evidence, I find that this is not true. I am not satisfied that Banerji has shown that Hancock’s aggressiveness in claim handling was materially less that of Provident.
Next, although Banerji may have put some stock in the fact that Hancock was a “local company” he was never led to believe that Hancock would behave differently than did Provident in the handling of his claim. There was no detrimental reliance on the implicit assumption that Hancock would be the company that would handle any claim submitted by Banerji.
I find that there was nothing improper about Provident’s acquisition of Hancock’s disability business and Banerji was not caused any legal harm as a result of this transaction.
Counterclaims for Emotional Distress
“In order to recover for negligently inflicted emotional distress, a plaintiff must prove: ‘(1) negligence: (2) emotional distress; (3) causation; (4) physical harm manifested by objective symptomatology; and (5) that a reasonable person would have suffered emotional distress under the circumstances of the case.’" Sullivan v. Boston Gas Co., 414 Mass. 129, 133, 605 N.E.2d 805, 807 (1993), citing Payton v. Abott Labs, 386 Mass. 540, 557, 437 N.E.2d 171 (1982).
“[T]he elements of a cause of action for intentional infliction of emotional distress include: ‘(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; ... (2) that the conduct was ‘extreme and outrageous’...; (3) that the actions of the defendant were the cause of the plaintiffs distress; . . . and (4) that the emotional distress sustained by the plaintiff was ‘severe’ . . .” Haddad v. Gonzalez, 410 Mass. 855, 871, 576 N.E.2d 658, 667 (1991) (citation omitted).
From the foregoing findings and rulings the court does not conclude that the defendants engaged in outrageous conduct. Furthermore the court does not find that the conduct described above is fairly described as grossly negligent, nor undertaken in callous disregard of the extreme emotional distress that would be reasonably and foreseeably incurred by an ordinary disabled policyholder in Dr. Banerji’s position, or that was greater than any reasonable policyholder in Dr. Baneiji’s position should be expected to endure. Although the court has ruled in favor of the plaintiff on the issue of coverage, there was a genuine good faith dispute between the parties on the legal requirement of attaching the application to the amended policy and a good faith dispute as to whether the application was provided to Dr. Baneiji. The other activities of the defendants in investigating the claims of Dr. Banerji were carried out in a reasonable fashion.
Order
The parties are to submit for the court’s approval a form of judgment which 1) awards damages to plaintiff in accordance with this memorandum of decision; 2) declares the rights of the parties in accordance with this memorandum of decision; 3) dismisses defendant’s counterclaims for breach of a duly of good faith and fan-dealing and under G.L.c. 93A, G.L.c. 176D against Hancock and Provident and for intentional infliction of emotional distress; and negligent infliction of emotional distress and enters judgment for the defendant on the plaintiffs claims for rescission.

 It doesn’t matter whether the issue is framed in terms of admissibility of evidence or in terms of what the insurance company may rely upon to avoid or rescind the policy. Technically die application with its misstatements could be “admissible” yet of no avail.

 Dr. Baneiji has requested the court to rule that an insurer seeking to maintain a rescission action must satisfy the intermediate burden of proof of “clear and convincing evidence.” See Protective Life Ins. Co. v. Sullivan, 425 Mass. 615, 616, 682 N.E.2d 624 (1997). But where the court finds and rules that Hancock has not persuaded the court on an issue even by a fair preponderance of the evidence it obviously has not persuaded the court by clear and convincing the evidence.

 Obviously the FEP application was not physically attached to the policy in view of the court’s finding of fact that the FEP application was not delivered. Thus the court need not discuss whether the law required the physical attachment of the policy.

 States, including Massachusetts, exclude reinstatements or renewals from the statutory attachment requirement. One source explains this is done because no new contract is effected. Couch on Insurance, §18:9 (3d ed. 1995). Another source simply states that an application for reinstatement is not an application for a policy, and that since it comes after “the policy is in the hands of the insured, [it] cannot be attached to the policy by the insurer” unless the policy is returned. 1 The Law of Life and Health Insurance, §4.01(1] at 4-23 (Matthew Bender ed. 1999). In essence, the disparate treatment of reinstatements or renewals stems from the lack of material information contained in those applications.

 Note that the objective of the attachment clause is fully effected by attaching the term addition and supplemental application to the original policy. That way all integrated parts of the insurance contract are before the applicant.